[No. D040234. Fourth Dist., Div. One. Dec. 18, 2003.]

In re the Marriage of JULIE and PETER JENSEN.

UBOLRATANA MAHIDOL, Appellant, v.
PETER L. JENSEN, Respondent.

COUNSEL

Law Offices of Allen I. Neiman, Allen I. Neiman and Amy L. Neiman for Appellant.

Law Offices of Stephen Temko, Stephen Temko; Cannon Parks & Oberhansley, Robert J. Parks and Marjeta D. Six for Respondent.

OPINION

McCONNELL, P. J.—We hold in this case that in a proceeding under the Family Code the superior court lacked in personam jurisdiction and subject matter jurisdiction to enforce provisions of the parties' marital settlement agreement (MSA) requiring an adult disabled child living in Thailand to visit his father in California. We further hold the court lacked subject matter jurisdiction to enforce provisions of the MSA requiring the mother to encourage and implement visitation and give the father written updates on their son's activities. The effect of those provisions is to control the son's conduct, and the mother has no legal authority over him because he has reached 18 years of age. Accordingly, the mother may not be subject to the court's contempt powers for any refusal or failure to sufficiently meet her affirmative duties under the MSA. The MSA purports to confer continuing subject matter jurisdiction on the trial court, but jurisdiction to adjudicate an adult child's personal rights, ostensibly through a parent, cannot be conferred by consent, waiver or estoppel. We reverse the court's order and remand the matter for its entry of a new order denying the father's request for visitation and other relief under the MSA.

## FACTUAL AND PROCEDURAL BACKGROUND

Ubolratana Mahidol, formerly Julie Jensen (Julie), and Peter L. Jensen (Peter) married in 1972, and Julie petitioned for dissolution of the marriage in

1998. The parties have three children: Ploypailin, born in 1981; Poomi, born in August 1983; and Sirikittiya Mai, born in 1985. Poomi is autistic.

The parties' MSA was incorporated into the August 2000 judgment on reserved issues. Under the MSA, the parties shared joint legal custody of the two minor children, Julie was awarded primary physical custody of them and Peter was awarded visitation. Further, the MSA acknowledged Julie's "close ties to her parents and to the country of Thailand," and gave her the right to move with the minor children to Thailand, subject to certain conditions affecting Poomi after he turned 18 years of age, including Peter's continued right to visitation, and Julie's obligations to encourage Poomi to visit Peter, to assist in the scheduling of visitation and "in carrying out all visitation schedules," and to keep Peter informed of Poomi's "activities, including academic, enrichment and extracurricular activities."

The MSA also stated: Poomi "currently suffers from a disability and falls within the scope of Family Code section 3910.[1] It is possible that after he attains age 18 Poomi may continue to be incapacitated from earning a living and without sufficient means. For so long as Poomi continues to be a person within the scope of . . . Section 3910, as determined by the court, *and for so long as the Superior Court . . . has jurisdiction over Poomi*, it shall make such custody, visitation and support orders as are reasonable, necessary and in his best interest." (Italics added.)

Julie moved with Poomi to Thailand in July 2001, after his graduation from Torrey Pines High School.[2] The following month Poomi turned 18 years of age. In October, Peter caused the issuance of an order to show cause regarding visitation. In a declaration, Peter stated Julie violated the MSA by not implementing visitation and by not informing him of Poomi's "academic, social, and extra curricular [*sic*] development or his medical status." Peter sought an order requiring Poomi to visit him in San Diego during Thanksgiving week.

In opposition, Julie, now represented by different counsel, argued the court lacked in personam jurisdiction and subject matter jurisdiction to make visitation orders concerning an adult child.[3] Julie unsuccessfully moved for dismissal of the order to show cause, and this court denied her petition for writ of mandate and request for stay, without prejudice to her seeking

---

[1] Statutory references are to the Family Code unless otherwise specified.

[2] Poomi's sister Mai, then 16 years of age, remained in California with Peter.

[3] Julie also argued travel to San Diego would not be in Poomi's best interest, because he "is in excellent educational and therapeutic programs in Thailand which are supervised by leaders in the field of autism," and his doctors agreed "that structure and continuity in Poomi's program is essential for him."

appellate review of the superior court's ruling. (*Jensen v. Superior Court* (Apr. 12, 2002, D039795) [summary denial order].)

At the April 2002 hearing, the court ruled the MSA gave it continuing jurisdiction over custody and visitation issues pertaining to Poomi. The court's order provides the "court sets a four-week period of visitation, four consecutive weeks starting June 15 and concluding on or about July 13," and the "court further orders a ten-day period in December 2002, which commences December 18 and concludes December 28." Additionally, the court's order requires Julie to (1) "cooperate and assist in scheduling visitation"; (2) cooperate "in carrying out this visitation by assisting Poomi in all respects by including getting him to the airport in Thailand and providing him with a person to accompany him on the flight here or in the alternative letting [Peter] receive him at the airport in Thailand, and have either him physically or one of his aides accompany Poomi over here from Thailand for the flight"; (3) "not interfere in or preclude visitation in any way and to encourage this visitation to take place"; and (4) "keep [Peter] informed once per month in writing of Poomi's activities, including his academic enrichment and extra-curricular activities."

This court granted Julie's petition for writ of supersedeas and request for stay of the order, pending disposition of her appeal.

## DISCUSSION

### I

Julie contends the trial court lacked in personam jurisdiction and subject matter jurisdiction to issue its order. These are questions of law we review independently. (*Gilliland v. Medical Board* (2001) 89 Cal.App.4th 208, 211–212 [106 Cal.Rptr.2d 863].)

### II

"The superior court has jurisdiction in proceedings under" the Family Code. (§ 200.) "In general, 'jurisdiction' to adjudicate matters in a marital case involves three requirements: 1) that the court have authority to adjudicate the specific matter raised by the pleadings (subject matter jurisdiction) (see . . . § 2010); 2) that the court have 'in rem' jurisdiction over the marital 'res' to terminate marital status ('in rem' jurisdiction) [citation]; and 3) that the court have jurisdiction over the parties to adjudicate personal rights and obligations (personal jurisdiction)." (*Muckle v. Superior Court* (2002) 102 Cal.App.4th 218, 225 [125 Cal.Rptr.2d 303].)

█ In personam jurisdiction requires a relationship between the person whose rights are at issue and the state, such as domicile or residence; due process, or notice and opportunity to be heard; and compliance with statutory requirements of process. (2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 110, p. 648.) The superior court indisputably lacked in personam jurisdiction over Poomi. Peter contends such jurisdiction was unnecessary because the court's order does not require Poomi to visit Peter, and thus his personal rights were not adjudicated. The court, however, did order visitation. The order is titled "ORDER RE VISITATION" and states the "court *sets a four-week period of visitation,* four consecutive weeks starting June 15 and concluding on or about July 13," and the "court further *orders a ten-day period [of visitation]* in December 2002, which commences December 18 and concludes December 28." (Italics added.)     █ Any order entered by a court without personal jurisdiction is void and subject to collateral attack at any time. (*Rochin v. Pat Johnson Manufacturing Co.* 67 Cal.App.4th 1228, 1239 [79 Cal.Rptr.2d 719].)[4]

█ Moreover, the court lacked subject matter jurisdiction to issue its order. "Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter . . . ." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942]; *In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 47 [231 Cal.Rptr. 757].) "Jurisdiction in any proceeding is conferred by law; that is, by the Constitution or by statute. Jurisdiction of the subject-matter cannot be given, enlarged, or waived by the parties." (*Harrington v. Superior Court* (1924) 194 Cal. 185, 188 [228 P. 15]; *Abelleira v. District Court of Appeal, supra,* at p. 288; *Marlow v. Campbell* (1992) 7 Cal.App.4th 921, 928 [9 Cal.Rptr.2d 516]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2003), ¶ 3.2, p. 3-2; 2 Witkin, Cal. Procedure *supra,* Jurisdiction, §§ 6, 12, pp. 551, 556.) An order entered by a court without subject matter jurisdiction is also void and subject to collateral attack. (*Rochin v. Pat Johnson Manufacturing Co., supra,* 67 Cal.App.4th at p. 1239.)

Section 2010 gives the superior court in a dissolution proceeding subject matter jurisdiction "to inquire into and render any judgment and make orders that are appropriate concerning," among other things, the "custody of *minor* children of the marriage." (§ 2010, subd. (b), italics added.) Further, section

---

[4] The dissent concludes the issue of personal jurisdiction over Poomi is not properly before this court, because Poomi has not appeared in this action and "[w]ithout some appearance on Poomi's behalf, we have no means of determining whether he is inclined, as is his right, to confer jurisdiction on the courts of this state by way of consent." (Dis. opn., *post,* at p. 604.) However, a principal issue on appeal is whether the family court had personal jurisdiction over Poomi to issue the visitation orders, and we are required to determine the issue based on the appellate record.

3022 provides: "The court may, during the pendency of a proceeding or at any time thereafter, make an order for the custody of a child *during minority* that seems necessary and proper." (Italics added; see also *Muckle v. Superior Court, supra,* 102 Cal.App.4th at p. 225; *Zaragoza v. Superior Court* (1996) 49 Cal.App.4th 720, 725 [57 Cal.Rptr.2d 1]; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2003) ¶ 3:4.1, pp. 3-2 to 3-3.) By statute, a minor is a person under 18 years of age. (§§ 6500, 6501.)

■  Visitation is a form of custody (*Perry v. Superior Court* (1980) 108 Cal.App.3d 480, 483 [166 Cal.Rptr. 583]), and thus under the plain terms of sections 2010, subdivision (b) and 3022 the court had no authority to issue a visitation order regarding Poomi after he reached the age of majority. "Our primary aim in construing any law is to determine the legislative intent. [Citation.] In doing so, we look first to the words of the statute, giving them their usual and ordinary meaning." (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 501 [247 Cal.Rptr. 362, 754 P.2d 708].)

■  Further, the court lacked subject matter jurisdiction to issue the provisions of the order purportedly affecting only Julie, such as encouraging Poomi to visit Peter, facilitating visitation and keeping Peter apprised of Poomi's activities. The orders are effectively aimed at controlling Poomi's conduct, but as an adult he is not *required* to visit Peter or share information with Peter, or Julie for that matter, unless he wishes to do so. Parental authority over a child ceases by operation of law when the child reaches the age of majority (§ 7505, subd. (c)), and, accordingly, the court may neither order a party to a dissolution action to assert control over an adult child, nor hold the party responsible for any reluctance or refusal of an adult child to visit or share personal information with the other party.

The dissent criticizes us for "choos[ing] the harshest possible interpretation" of the MSA. (Dis. opn., *post,* at p. 601.) The dissent concludes "that following Poomi's 18th birthday, the parties' intent was to control only their own conduct, not Poomi's, and that intent kept their agreement within the subject matter jurisdiction of the court." (Dis. opn., *post,* at p. 602.) The dissent, however, ignores the fact that the court's order exposes *Julie* to its contempt powers, should she return to California, for ostensible refusals or failures to sufficiently encourage Poomi to visit Peter, implement visitation or keep Peter apprised of Poomi's progress and activities. Julie's ability to comply with the MSA, of course, depends on Poomi's cooperation. Indeed, the dissent states that because Poomi has reached 18 years of age, provisions of the MSA affecting him are "now presumptively subject to [his] consent." (Dis. opn., *post,* at p. 602.) The Legislature has fixed the time when disputes between parties to a dissolution proceeding regarding custody and visitation of their children must end, and that time is when the children reach the age of majority. (§§ 2010, subd. (b), 3022.)

Indeed, it appears the parties as well as the court realized from the inception that the provisions of the MSA regarding Poomi as an adult were likely unenforceable. For instance, the MSA states that "for so long as the Superior Court of the State of California, County of San Diego, has jurisdiction over Poomi, it shall make such custody, visitation and support orders as are reasonable, necessary and in his best interest." Further, at a hearing held approximately two months after the marital settlement agreement was incorporated into the judgment on reserved issues, the court noted it would lose jurisdiction over custody and visitation issues related to Poomi when he reached 18 years of age, and perhaps the parties would continue their legal battle through probate court.

Peter contends, and the dissent appears to agree, that the court retained subject matter jurisdiction to enforce the MSA beyond Poomi's age of majority because of the unusual circumstances. Peter asserts the degree of Poomi's autism prevents him from communicating normally or being independent, and thus Julie's cooperation and assistance is required to ensure visitation between Poomi and Peter. Peter points to evidence showing Poomi wishes to visit Peter in San Diego, and experts believe contact with Peter is in Poomi's best interests.

■   The Family Code, however, does not authorize the court to order visitation between a party to a dissolution proceeding and a disabled adult child. The appellate record does not suggest Poomi was ever the subject of a guardianship or is now the subject of a conservatorship (see Prob. Code, § 1400 et seq.), and absent evidence to the contrary, we assume that as an adult he has the capacity to determine whether he wishes to travel to San Diego to visit Peter or share personal information with Peter. We have found no California opinion directly on point, but courts in other jurisdictions have held that in family law proceedings, the court lacks subject matter jurisdiction to issue custody or visitation orders affecting adults, and disabled adults in particular, and issues pertaining to their care must be adjudicated in conservatorship proceedings. (See, e.g., *In re Marriage of Casarotto* (2000) 316 Ill.App.3d 567, 570–573 [736 N.E.2d 1169, 1172–1174, 249 Ill.Dec. 731] [court lacked jurisdiction to order visitation between father and adult child with Down's syndrome]; *Kilby v. Kilby* (Jan. 28, 1999) 1999 Tenn.App. LEXIS 57 [court lacked jurisdiction to grant mother custody of adult child who was blind and mentally disabled as the result of a stroke].)[5]

---

[5] Julie relies on *Dittrich v. Gobey* (1898) 119 Cal. 599 [51 P. 962], in which the parties to a dissolution entered into an agreement under which their daughter would reside with her father until she reached 18 years of age, and then be "return[ed] to her mother." (*Id.* at p. 600.) The California Supreme Court held the agreement was void because the daughter "attained her majority; her right of freedom from personal restraint was then as perfect as it could ever become; and her mother's right to her custody was at an end." (*Id.* at p. 601.) The court

■ Peter submits that since the superior court has concurrent jurisdiction to hear both probate and family law proceedings, "whether the visitation provisions of the MSA are enforced in the probate department or in the family law department is irrelevant." The court, however, purported to act under the Family Code, and thus its authority to grant the requested relief is governed by provisions of that code. "Although this may appear unduly technical, the consequences of a contrary result are significant." (*In re Marriage of Casarotto, supra,* 316 Ill.App.3d at p. 572 [736 N.E.2d at p. 1173].) For instance, the Probate Code affords a disabled adult protections unavailable under the Family Code, such as notice of a petition for conservatorship, the right to attend the hearing and contest the matter, and the rights to counsel and a trial by jury. (Prob. Code, §§ 1824, 1825, 1826.)

■ Additionally, Peter relies on section 3910, which the MSA cited as supposedly giving the court continuing jurisdiction over visitation. That statute provides the "father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means." (§ 3910, subd. (a).) The statute, however, does not bear on the court's authority to order visitation with an adult child. ■ Peter's reliance on section 3587, which provides for the enforceability of an agreement for child support beyond the age of majority, is similarly misplaced as there is no corollary in the Family Code for custody or visitation.

In concluding the court properly ordered Julie's compliance with her affirmative duties under the MSA, the dissent relies in part on "the rationale of out-of-state cases which have upheld orders requiring former spouses to pay for their adult offspring's college education when, in the absence of divorce, the parent was likely to provide a college education." (Dis. opn., *post,* at p. 603, citing *Childers v. Childers* (1978) 89 Wn.2d 592, 601–602 [575 P.2d 201, 207–208].) In *Childers v. Childers,* the lower court *ordered* the father to pay support for the parties' adult children while they were attending college, and the Supreme Court of Washington upheld the order, explaining that under the state's dissolution act the court had discretion to order child support for a "dependent" adult child. (*Id.* at pp. 595–596 [575 P.2d at pp. 204–205].)

---

explained a "stipulation to 'restore' the daughter . . . when she would be eighteen years old was as much a contract to infringe her personal liberty as if the age fixed had been thirty-six or fifty-four years, and was unlawful." (*Ibid.*) Although *Dittrich v. Gobey* does not discuss subject matter jurisdiction, it is instructive.

*Childers v. Childers* is inapplicable, because in California the child support obligation normally ends when the child reaches 18 years of age. (§ 6500.)[6] Parents have no *legal* obligation to pay for the college education of an adult child. (*In re Marriage of Smith & Maescher* (1993) 21 Cal.App.4th 100, 107–108 [26 Cal.Rptr.2d 133].) A parent may agree to pay for such expenses, but the court's jurisdiction in a dissolution proceeding to enforce the agreement is *statutory*. (§ 3587.) Here, the court has no statutory jurisdiction to enforce the provisions of the MSA agreement, and thus the educational expenses issue is not analogous.

Likewise unavailing is Peter's reliance on *In re Marriage of Hinman* (1992) 6 Cal.App.4th 711 [8 Cal.Rptr.2d 245] (*Hinman*). In *Hinman,* the wife petitioned for dissolution of marriage, listing five minor children of the marriage. The wife's husband from a former marriage, though, fathered the two oldest children. The parties entered into a settlement agreement that gave them joint physical and legal custody of the five children, who were to continue living with the husband in the family home. The wife later moved to remove custody of the older two children from the husband, on the ground he was not their biological father and thus the court acted in excess of its jurisdiction. The trial court denied the motion, and the Court of Appeal affirmed the ruling.

The court explained that although statutorily the trial court had authority to make custody orders pertaining to children *of the marriage* (see § 2010, subd. (b)), the court did not lack fundamental subject matter jurisdiction, but merely acted in excess of its jurisdiction, and under principles of estoppel and waiver the wife could not attack the order on jurisdictional grounds. (*Hinman, supra,* 6 Cal.App.4th at p. 717.) The court concluded that allowing the wife "to consent to a judgment awarding [the husband] joint custody and then have the unlimited power to undo that arrangement at any later time by claiming lack of jurisdiction would violate California's strong policy in favor of preserving an established mode of child custody 'unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest.' [Citations.]" (*Id.* at pp. 718–719.)

We are not required to determine whether we agree with the *Hinman* court's analysis of the subject matter jurisdiction issue, because this case is factually distinguishable. Peter seeks visitation with Poomi, an adult, but Poomi is not before the court. Further, Peter seeks to force Julie to ensure that visitation occurs, and that Peter receive personal information regarding

---

[6] However, the parents' statutory support obligation continues for an unmarried 18-year-old child who is a full-time high school student and not self-supporting, until the child graduates or turns 19 years of age, whichever occurs first. (§ 3901, subds. (a) & (b).)

Poomi, even though she is legally powerless to comply. The public policy interest in *Hinman* and cases cited therein, continuing an established mode of custody, is not at issue.

We conclude the parties could not authorize the court to adjudicate Poomi's personal interests after he turned 18 years of age. Generally," 'subject matter jurisdiction cannot be conferred upon a court by consent, waiver or estoppel.' " (*In re Marriage of Arnold & Cully* (1990) 222 Cal.App.3d 499, 503 [271 Cal.Rptr. 624], citing *In re Marriage of Ben-Yehoshua* (1979) 91 Cal.App.3d 259, 263 [154 Cal.Rptr. 80].) The court's order is void for lack of personal and subject matter jurisdiction.[7]

## DISPOSITION

The order is reversed in its entirety, and the matter is remanded to the trial court for its entry of a new order denying Peter's request for visitation and other relief under the MSA. The stay issued on June 26, 2002, is vacated. Julie is awarded costs on appeal.

Nares, J., concurred.

**BENKE, J.**—I respectfully dissent.

### I

At the outset I think it is helpful to consider more fully the very difficult circumstances confronting Ubolratana Mahidol, formerly Julie Jensen (Julie), and Peter L. Jensen (Peter) at the time they reached the agreements set forth in the marital settlement agreement (MSA). Shortly after the MSA was incorporated into the judgment, their son Poomi was evaluated at the H.E.L.P. Group/UCLA Neuropsychology Program. At the time of the evaluation, Poomi "[had] significant deficits in executive abilities. This means that in his everyday life he has little ability to independently monitor, self-evaluate, entertain and process information (both cognitively and socially), or to inhibit inappropriate thoughts and behaviors. This leaves him helplessly vulnerable in certain situations, and explains why he acts impulsively and inappropriately many times."

The evaluators expressed concern that Poomi's behaviors "could lead to criminal investigations which would be tragically unfortunate. Poomi has already experienced several situations that potentially could have gotten out

---

[7] Given our holding, we are not required to address Julie's claim the court erred by refusing to issue a statement of decision.

of hand (e.g., his recent incident on the roller coaster [when he lunged at another person], the instance at 7-11 [when he began yelling at someone], and the public restroom experience [when he approached another man while he was using the facilities]).")

At that time the evaluators reported "[b]oth parents related the desire to try anything in order to help Poomi and both related the importance of the other parent in Poomi's life." Although the evaluators identified Julie as Poomi's primary caregiver, they noted that Peter "sees Poomi 3-4 times/week for approximately 2 hours, and one weekend a month. By all reports, he has been instrumental in teaching Poomi how to surf, swim, play soccer and play tennis."

The evaluators found "Poomi's long-term prognosis is bleak insofar as he will never reach independence in life's major activities. For this reason he will always need constant and familiar support systems to ensure his psychological wellbeing and safety, as well as for those who may encounter this young man. The basic defects found in individuals with Autism are *pervasive* and *persistent*." The evaluators stated that "with respect to Poomi's long-term prognosis, it is critically important to Poomi's success that his parents put aside their differences and ***communicate regularly*** regarding Poomi's progress and important treatment decisions to come. Each parent has and will continue to play an important role in his life. Poomi's best chance for success depends on continuity and stability in his life. Ultimately, this means frequent interactions with *both parents* as well as his sisters."

Because of the extensive resources available to Poomi in Thailand and because of the protection he would be afforded as a prince in the Thai royal family, the evaluators supported Julie's decision to return to Thailand with Poomi. However, the evaluators stated: "We want to re-iterate the importance of Poomi's father in Poomi's life. Poomi has a developmentally important bond with his father which should be allowed to continue and grow. Mr. Jensen must be allowed appropriate and frequent visits to his son as set forth in the MSA for the purpose of ensuring the continued bonding."

The terms of the MSA, by which Poomi was permitted to go to Thailand with his mother with the understanding she would take steps to preserve Poomi's bond with his father, reflect an obvious attempt by both Julie and Peter to provide Poomi with what the expert evaluators found was in Poomi's long-term best interest: the extensive support and protection of the Thai royal family *and* an ongoing relationship with his father. Given the serious, conflicting and painful interests involved here and the obvious attempt of both parents to do what was in their son's best interest, any consideration of the parents' resolution of their differences should begin with a presumption

of its validity. Such a presumption of validity is of course suggested not only by the unique and difficult circumstances which gave rise to the MSA, but also by our obligation to interpret any agreement so that it is lawful and valid. (Civ. Code, § 1643; *City of San Diego v. Rider* (1996) 47 Cal.App.4th 1473, 1490 [55 Cal.Rptr.2d 422].)

## II

### A. Effective Aims

My colleagues have found those provisions of the MSA which impose upon Julie affirmative duties with respect to providing visitation assistance to Poomi and information about his circumstances to Peter are *"effectively aimed at controlling Poomi's conduct."* (Maj. opn., *ante*, at p. 594, italics added.) Because they believe the obligations imposed on Julie are "effectively aimed" at controlling Poomi, the majority concludes those duties are beyond the subject matter jurisdiction of a court sitting in a dissolution action. (Maj. opn., *ante*, at p. 594.)

I have not found any reported case which speaks in terms of the "effective aims" of a contract or MSA. Rather, the operative language in cases too numerous to list here in their entirety focuses on the paramount role the *intent of the parties* plays in interpreting and enforcing contracts in general and marital settlement agreements in particular. (See e.g. *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [135 Cal.Rptr.2d 505]; *Sy First Family Ltd. Partnership v. Cheung* (1999) 70 Cal.App.4th 1334, 1341 [83 Cal.Rptr.2d 340]; *Porreco v. Red Top RV Center* (1989) 216 Cal.App.3d 113, 119 [264 Cal.Rptr. 609]; *In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439–1440 [64 Cal.Rptr.2d 766] [marital settlement agreements]; Civ. Code, § 1636; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 684, p. 617.) Thus, it is difficult to see any meaningful distinction between the "effective aims" of an agreement and the mutual intent of the contracting parties. Because the majority faults the MSA for its aims and because those aims cannot be distinguished from the intention of the parties, the parties' intent is in fact at the heart of this appeal.

### B. Julie and Peter's Aims

There is nothing on the face of the MSA or in any other part of the record which supports the majority's conclusion as to the aims or intent of the MSA. The MSA simply requires that Julie provide Poomi with assistance in visiting Peter and that in addition she provide Peter with information about Poomi's

condition. It is plain that given Poomi's condition, the beneficial bond Poomi enjoyed with his father could not be maintained unless Poomi stayed in this country or Julie agreed to provide Poomi with assistance in visiting his father and also provide Peter with information about Poomi's condition. In characterizing his parents' attempt to provide Poomi both with the benefits available in Thailand and a continuing relationship with Peter as "aiming" to control Poomi, the majority has chosen the harshest possible interpretation of the parties' agreement when in fact a far more benign interpretation is possible.

In this regard the majority's reference to *Dittrich v. Gobey* (1898) 119 Cal. 599 [51 P. 962] (*Dittrich*) is, as the majority notes, instructive. (Maj. opn., *ante*, at p. 595, fn. 5.) In *Dittrich* the disputed marital agreement provided that when their minor daughter reached her majority, the father would " 'return her to her mother.' " (*Dittrich, supra*, 119 Cal. at p. 600.) The agreement further provided that if the father failed to meet his obligations, he would pay the mother $1,000 in liquidated damages. When the daughter turned 18, she refused to return to her mother. The father then died and the mother made a claim against his estate. The trial court rejected the claim and its judgment was affirmed on appeal. The Supreme Court affirmed for alternative reasons. First, the court stated: "In the particular of the contract which gives rise to this dispute, viz; that concerning the restoration of [the daughter] to the plaintiff when the former should reach the age of eighteen years, *we doubt whether more is reasonably imported by the instrument than that the father would then afford facilities to the daughter for return to her mother in case she desired to return.*" (*Id.* at p. 601, italics added.) In interpreting the agreement so that it was lawful, the court in *Dittrich* was of course doing no more than is required by Civil Code section 1643, which states: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." The interpretative generosity which the court displayed in *Dittrich* and which is required by Civil Code section 1643 is of course absent from the majority opinion in this case. In light of the majority's citation to *Dittrich*, the majority's rigid interpretation of the MSA is curious because the requirement that the daughter be "returned to her mother" seems just as much, if not more, of an imposition on the daughter than any visitation requirements the MSA imposes on Poomi. If the court in *Dittrich* was willing to interpret the requirements in that agreement as being subject to the daughter's desires, the majority should offer some reason why Julie and Peter's MSA cannot be interpreted in a similar fashion. I see no reason why, as in *Dittrich,* the MSA cannot be interpreted as requiring visitation by Poomi until he reached his majority and thereafter requiring Julie to assist Poomi in visiting his father if Poomi desired to do so.

I recognize that as an alternative to its interpretation of the agreement, the court in *Dittrich* stated: "If, however, the contract is to be understood as an

unconditional agreement on the part of [the father] to return [the daughter] at the age of eighteen years to the plaintiff, then it was to that extent void. For at that age the daughter attained her majority; her right of freedom from personal restraint was then as perfect as it could ever become; and her mother's right to her custody was at an end." (*Dittrich, supra*, 119 Cal. at p. 601.) What the court said in *Dittrich* concerning an agreement *requiring* visitation is of course undeniable: in general, adult offspring cannot be required to visit their parents. The question we confront here of course is quite different from the alternative rationale adopted by the court in *Dittrich*. While the court in *Dittrich* considered whether an unconditional visitation requirement may be imposed on an adult, we are not required to confront that clearly settled issue. We are only asked to determine whether in fact such an agreement was made by Julie and Peter. Like the court in *Dittrich* and as required by Civil Code section 1643, I would find that no such agreement was made. Here, we have an agreement which, although it speaks of visitation with a parent and requires affirmative steps by one parent, is now presumptively subject to the Poomi's consent and therefore valid.[1] (*Dittrich, supra*, 119 Cal. at p. 601.)

In sum, I think the record here shows that following Poomi's 18th birthday, the parties' intent was to control only their own conduct, not Poomi's, and that intent kept their agreement within the subject matter jurisdiction of the court.

## III

The majority's unwillingness to interpret the MSA so that it is valid and enforceable will in the end only injure the interests of disabled adults without providing them any additional protection. At this point any interested person who believes the rights of a disabled adult are being infringed upon and that the disabled adult is unable to assert those rights for himself may bring a conservatorship petition under the provisions of Probate Code section 1800 et seq. and employ the power of the probate court to protect the disabled adult's

---

[1] In this regard *In re Marriage of Casarotto* (2000) 316 Ill.App.3d 567 [736 N.E.2d 1169, 1172–1174, 249 Ill.Dec. 731], and *Kilby v. Kilby* (Jan. 28, 1999) 1999 Tenn.App. LEXIS 57, are readily distinguishable. *In re Marriage of Casarotto* involved an order which required visitation by an adult offspring *over his objection*. Here of course we have no record which reflects Poomi's desires. *Kilby v. Kilby* involved a custody order obtained after a disabled child had reached her majority. Here, in contrast, the MSA was entered into when Poomi was still a minor and subject to his parents' control. Unlike the circumstances considered in *Kilby v. Kilby*, the question we are asked to decide is not whether he is still subject to that control, but whether Julie is still obligated to provide Poomi with the assistance he needs in the event he wishes to maintain his relationship with his father.

interests. Given the protection available under the Probate Code, any agreement between estranged parents which allocates the responsibility for assisting a severely disabled adult offspring in getting to and from each parent's home, college or work, represents no material intrusion on the adult offspring's interests.

On the other hand, agreements such as the one Julie and Peter entered into offer important benefits to dependent adult offspring. Here, Julie's promises to Peter provided Peter the obvious assurance he needed in order to consent to Julie's desire to take Poomi to Thailand. It is not difficult to imagine that there are countless other disabled children who would benefit substantially from the willingness of their separating parents to make binding provisions for their care, not only during their minority but also when they become adults. In this regard I think it is helpful to consider the rationale of out-of-state cases which have upheld orders requiring former spouses to pay for their adult offspring's college education when, in the absence of divorce, the parent was likely to provide a college education. "In allowing for divorce, the state undertakes to protect its victims. . . . 'A number of courts adopt the policy that a child should not suffer because his parents are divorced. The child of divorced parents should be in no worse position than a child from an unbroken home whose parents could be expected to supply a college education. . . .' [¶] . . . [¶] Where the disability is internally or externally caused, the child whose parents are still married will most often continue to receive support after majority. To terminate support when the parents are divorced creates a special disadvantage not shared by children whose parents remain together. If the father could have been expected to provide advanced education for his child, it is not unfair to expect him to do so after he has been divorced." (*Childers v. Childers* (1978) 89 Wn.2d 592 [575 P.2d 201, 207–208].) Disabled adult offspring are in many respects in the same position as adult offspring who need a college education. When a marriage remains intact, disabled children have the benefit of their parents' ongoing voluntary agreements as to the means and mode of their care and support, which benefit will likely continue into their adulthood. There is no good reason to deprive disabled children whose parents are dissolving their marriage of the functional equivalent of the ongoing mutual support they would otherwise receive after they become adults: binding agreements as to the assistance each parent will provide the disabled offspring and perhaps more importantly, binding agreements as to the assistance each parent will provide the other.

IV

I note Poomi has not appeared in this action himself and no one has been authorized to appear on his behalf. This incontrovertible fact undermines two issues relied upon by the majority: the court's lack of personal jurisdiction

over Poomi (maj. opn., *ante*, at pp. 592–593) and Poomi's supposed interest in preventing his mother from disclosing his activities to his father (maj. opn., *ante*, at p. 594).

With respect to personal jurisdiction, it is axiomatic that defects in personal jurisdiction may be waived by way of appearing and contesting the merits of an action. (Code Civ. Proc., § 410.50, subd. (a); *Brown v. Douglas Aircraft Co.* (1958) 166 Cal.App.2d 232, 236 [333 P.2d 59].) In a civil proceeding, appearance may occur when an attorney, who has been authorized to act on behalf of a litigant, contests the merits of the action. (Code Civ. Proc., § 1014.) In the case of a minor or incompetent, a guardian may appear on behalf of his or her ward or authorize such an appearance. (2 Witkin, Cal. Procedure, Jurisdiction, § 187, p. 750.) In California a party may also appear specially to contest in personam jurisdiction. (See *Wolfe v. Alexandria* (1990) 217 Cal.App.3d 541, 549–550 [265 Cal.Rptr. 881].)

Here, of course, neither Poomi nor anyone purporting to act on his behalf has appeared either generally or specially to contest personal jurisdiction. In light of these circumstances, I must disagree with the majority's contention that the question of personal jurisdiction over Poomi is properly before us. While I certainly agree a judgment or order which is not supported by personal jurisdiction is void and subject to collateral attack, here the record simply does not permit us to determine whether, as against Poomi, the order is void. We can discuss and eliminate all means of exercising personal jurisdiction over Poomi, *save one*: jurisdiction by way of Poomi's consent. The only way of eliminating that means of exercising personal jurisdiction over him is to hear from him or his authorized representative either by special or general appearance. Without some appearance on Poomi's behalf, we have no means of determining whether he is inclined, as is his right, to confer jurisdiction on the courts of this state by way of consent.

Although Poomi is severely disabled and would probably appear by way of a representative, this unfortunate circumstance should not cause us to presume we know his wishes. Because it is possible Poomi is willing to consent to jurisdiction and thereby render the trial court's order valid even as to him, this record simply does not permit us to resolve the question of whether the court has personal jurisdiction over him. In this regard the majority seems to have failed to fully appreciate the distinction between personal jurisdiction which may be waived and subject matter jurisdiction which cannot. (See *Marlow v. Campbell* (1992) 7 Cal.App.4th 921, 929 [9 Cal.Rptr.2d 516].)

The absence of anyone authorized to act on Poomi's behalf in these proceedings also impacts the majority's concern about disclosure of personal information about Poomi. While interesting, until a court has determined Poomi's wishes or at the very least determined who is empowered to act on

his behalf, the majority's discussion of Poomi's supposed interest in preventing his father from knowing about his health and activities is premature. It may well be that, notwithstanding the views of the majority, Poomi is entirely satisfied with the terms of the order.

Rather than relying on matters which Poomi has not yet himself raised, a better course might be to simply note the absence of anyone empowered to act in Poomi's interest and state the self-evident proposition that because Poomi is not a party to these proceedings, our disposition is without prejudice to Poomi's right to challenge enforcement of any order.

## CONCLUSION

In the end I think my disagreement with the majority comes down to the level of freedom we will permit parties to exercise upon the dissolution of their marriages. I view marital settlement agreements as contracts which parties are free to enter and which we may not alter unless we are given some authority permitting us to do so. (See Civ. Code, § 1643.) My colleagues, on the other hand, seem to view a marital settlement agreement as something different because they believe some statutory provision must expressly authorize each of its terms. I think my view of marital settlement agreements is more consistent with the authorities which treat marital settlement agreements as agreements subject to the rules governing contracts in general. (See *In re Marriage of Iberti, supra,* 55 Cal.App.4th at pp. 1439–1440.)

Here, in the midst of an unfortunate dissolution action two parents agreed to do what was in the best interest of their severely disabled offspring. The agreement involved substantial compromise by both parents: one parent agreed to permit the child to leave the country; the other agreed to assist the child if he wished to return and to provide information as to the child's continued well-being. There is no lawful reason this agreement should not be enforced. (See *Dittrich, supra,* 119 Cal. at p. 601; Civ. Code, § 1643.)

I would affirm the trial court's order subject to any objection interposed by Poomi or someone authorized to act on his behalf.

Respondent's petition for review by the Supreme Court was denied April 14, 2004.