Filed 12/4/20; Modified and Certified for Publication 12/21/20 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of ANNA NAVARRETE.<br><br>RODOLFO NAVARRETE,<br><br>     Petitioner and Respondent,<br><br>v.<br><br>ANNA NAVARRETE, an Incompetent Person, etc.,<br><br>     Objector and Appellant. | E070210<br><br>(Super.Ct.No. RIP1600752)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Thomas H. Cahraman, Judge. Reversed.

Brown White & Osborn and Mark J. Andrew Flory, attorneys for Objector and Appellant.

No appearance for Petitioner and Respondent.

Anna Navarrete is an adult child of Maria Navarrete (mother) and Rodolfo Navarrete, Sr. (father), who split up during the dispute that led to this appeal. Navarrete is a 33-year-old woman who has cerebral palsy and a speech disorder which limit her ability to answer questions and express her needs and desires. Mother has been her primary caregiver.

Mother filed a petition asking to be appointed Navarrete's probate conservator. Navarrete's father and older brother objected to mother's petition, and her brother filed a competing petition asking to be appointed instead. Mother and father also sought domestic violence restraining orders against each other.

Lurking behind this dispute is the accusation that father sexually assaulted and raped Navarrete. At trial, Navarrete's therapist, mother, and younger brother, Adrian Navarrete (Adrian), said Navarrete told them her father sexually assaulted and raped her and she fears her father. Father testified and denied the accusations. The trial court interviewed Navarrete, but concluded she wasn't a competent witness before eliciting any testimony from her about the assaults. In the end, though the court expressed uncertainty about what had happened, it found mother hadn't proven the accusations of sexual assault by a preponderance of the evidence, but also found Navarrete had genuine fear of her father and didn't want to see him.

The trial court appointed mother as Navarrete's probate conservator and denied the brother's petition. Later, after further hearings, the trial court granted father visitation and ordered Navarrete to attend joint counseling sessions with her father. The court

2

concluded, over the objection of Navarrete, her conservator, and her attorney, that such visits were in her best interest because it would allow reconciliation in the event the accusations of sexual assault weren't true.

The visitation order is the only part of the case challenged on appeal. Navarrete attacks the order in several ways. First, she argues the conservatorship statute reserves to her as an adult conservatee the choice to refuse visitors. Second, she says the court order violates her constitutional right to privacy and autonomy under the California Constitution. Third, she says the court abused its discretion by determining visitation with her father was in her best interest despite her accusations and her genuine fear of him. In the alternative, she argues the trial court was wrong to bar her testimony, which would have established her father abused her and made plain that visits are not in her best interest. Father and the older brother have not filed briefs.

We hold the court did not have the authority to order Navarrete to attend joint counseling sessions with her father and therefore reverse the order.

**I**

**FACTS**

Anna Navarrete has cerebral palsy, a developmental speech and language disorder, and an anxiety adjustment disorder. She had a kidney transplant as a teenager and takes several medications to manage her condition. Her mother has always attended to her medications.

Mother said Navarrete is able to help around the house by cooking and doing laundry. She's also able to work part-time outside the house. The details of her employment didn't come out at trial, but her mother said she had been working from 8:00 a.m. to 2:30 p.m. without supervision by a family member. She made friends at work, including a boyfriend, who was also disabled. However, Navarrete stopped working after an incident in April 2016, when she and her boyfriend were found engaged in sexual conduct at the workplace. Though they don't see each other often now, they're still friends and communicate by texting each other.

On July 29, 2016, Navarrete's mother filed a petition to be appointed her probate conservator. Navarrete's older brother, Rodolfo Navarrete, Jr. (Rudy), filed an objection to mother's petition and later filed a petition asking that he be appointed as her conservator. Navarrete's father also filed an objection to naming mother as conservator, and mother objected to Rudy's petition. Navarrete's father also asked the court to order visitation between himself and Navarrete.

The trial court held a trial on the competing requests over several days from February to June 2017. Mother, father, Rudy, Adrian, and Navarrete's therapist testified at trial, and the trial court interviewed Navarrete, but found her not competent to testify.

A. *Accusations of Sexual Assault and Rape*

The conflict within the family appears to have started, or at least escalated, shortly after May 31, 2016, the night Navarrete accused her father of having molested and raped her.

According to mother, she woke around 3:00 a.m. that morning when she heard people talking. She said father had kicked her out of their shared bedroom and she was sleeping alone in their guest room. She got out of bed and found Navarrete was awake and in her bathroom, and father was awake and in his own bathroom. She said the fact that both were up at the same time made her suspicious, so she asked Navarrete about it the next morning. "I asked Anna, 'Why were you awake in the morning and your father was awake too?' [¶] She goes, 'Oh, he was in my room.'" Mother asked her what happened in her room, and Navarrete said, "'he went into bed. You know, he started touching me,' in [my] private." Mother said her body language indicated she was "[k]ind of, like scared to tell me what happened."

Navarrete's younger brother, Adrian, said she came to him around 7:30 a.m. that morning after talking to her mother. He said she "was very distressed and emotional. She was crying a lot, and while – she was shaking her hands a lot, as if she couldn't control herself. [¶] . . . [¶] She told me that her father had raped her." Asked for her exact words, he said, "She had told me that he had stuck his – well, she used the word 'dick' inside her private word, and she moved her hands towards her bottom to show that." She also said, "he had stuck his dick in her mouth and she pointed to her mouth" and "touched her in

5

her breasts and private word, down there, and she would move her hand, showing, you know, how he had touched her." Adrian also testified about Navarrete's reaction when she saw her father in the hallway during trial. "She was very shaken up. She was wanting to cry and she couldn't look at my father in the eyes. He would – she would look down. She didn't want to look at him, and she – when everyone would ask if she was okay, she would kind of shudder whenever she would talk, speak."

They didn't call the police or confront father immediately. They said they wanted to talk to Navarrete more and make sure what she was saying was true. However, mother became angry about the abuse at dinner and pulled a knife on father and held it close to his throat. She and Adrian said it was a butter knife, but father said it was something much sharper. The confrontation ended without further violence, but became the basis for father's request for a domestic violence restraining order against mother.

The same night around 10:00 p.m., both mother and Adrian talked to Navarrete again about what had happened the night before.[1] According to mother, Navarrete used simple words to say her father had gotten into bed with her naked, touched her breasts and vagina, and had sexual intercourse with her. "Adrian and me were asking her, mostly Adrian, and we would ask her what he had done to her and she would tell us that, you know, he had touched her. We would ask her, where? [¶] She would say, 'Down there.' And we would go, 'Where down there?' [¶] She would point with her hand down there.

---

[1] Counsel for father and the older brother objected to mother's testimony about Navarrete's accusations on hearsay grounds. The trial court recognized the hearsay issue but allowed the testimony for purposes other than the truth of the accusations.

'What else did he do?' [¶] 'He would touch my boobs.' She would say it like that. [¶] 'Was there anything else that he had done?' [¶] 'Yeah. He would tell me to lick his dick [¶] . . . [¶] [a]nd then he would put it in my mouth." During this later conversation, Navarrete said father had sexually assaulted and raped her on other occasions.

Mother and Adrian said they called police the next day, on June 1, after Navarrete returned home from work. A police officer arrived and talked to mother and Adrian, but didn't question Navarrete. The officer told them to go to the police station, where police spoke to mother, Adrian, and Navarrete. They then went to a hospital for a rape kit test. Later that evening the police searched the home, and at some point that day they arrested Navarrete's father.

Navarrete began counselling with Valerie Fluker around June 26, 2016 because of anxiety related to the sexual abuse. Fluker was at the time a professional clinical counselor intern at Central Counseling Services in Riverside. Fluker said Navarrete has difficulties communicating, but she understands Navarrete's speaking and Navarrete is also able to communicate by writing on a whiteboard.

Navarrete told Fluker she was sexually assaulted by her father. She said her father kissed her inappropriately, indicating her breasts and vaginal area by marking the body parts on a drawing of a human figure. She also told Fluker she was raped by writing "Dad raped me" and "in both bedrooms" on a whiteboard. She told Fluker she didn't want to see her father because she was afraid of him. Though the trial court permitted this testimony to show state of mind, it didn't admit the testimony for the truth of the matter

7

asserted and refused to recognize Fluker as an expert, decisions Navarrete doesn't

challenge on appeal. Fluker said Navarrete was still having weekly counseling sessions.

B. *Father's Denial of the Accusations*

Father categorically denied the accusations against him. He said he never abused

Navarrete and never sexually abused her. He said he first learned of the accusations on

June 1, the day police arrested him. Police took him to the police station and detained him

for several hours. He said they released him and hadn't charged him as of the date of

trial, more than a year later.

C. *Navarrete's Interview with the Court*

Late in the trial, Navarrete proposed to testify herself, and counsel for her father

and older brother asked the court to inquire about her capacity to testify before allowing

her to discuss the allegations against father. The court agreed it would interview

Navarrete and evaluate whether she was qualified to testify under Evidence Code section

701. "[T]he Court will ask questions of Anna Navarrete, and give the answers the weight

to which they are entitled, if any, pursuant to Section 701 of the Evidence Code and the

case law construing that statute."

Section 701 of the Evidence Code allows disqualification of a witness only if the

witness is "[i]ncapable of expressing himself or herself concerning the matter so as to be

understood, either directly or through interpretation by one who can understand him; or

[¶] . . . [i]ncapable of understanding the duty of a witness to tell the truth." (Evid. Code,

§ 701, subd. (a).) The statute allows the court in a bench trial to "reserve challenges to the

8

competency of a witness until the conclusion of the direct examination of that witness." (Evid. Code, § 701, subd. (b).)

With the help of her attorney and family members, Navarrete was able to make herself understood to the court. She gave basic one or two word answers to questions about her day-to-day life on topics that had already come up through the testimony of other witnesses. For example, the court asked, "Your mother has her room, and Adrian has his room, and you have yours, or do you share a room?" Navarrete responded, "Share, no." The court asked, "You don't share a room, you have your own room; right?" and she responded, "Uh-huh." The court then tried suggesting otherwise, asking, "Do you have your own room where you have it to yourself to sleep, or do you share a room with your mother or your brother." She responded, "No." The court asked a similar series of questions about the location of her bathroom, and Navarrete gave accurate answers.

The court then asked Navarrete a series of questions to see whether she could distinguish truth from falsity and understood she was required to tell the truth in court. The court asked, "At the courthouse, are we supposed to tell the truth to the judge, or should we just say whatever the judge might want to hear? What do you think about that?" She responded, "Say truth." The court asked, "[I]f I were to say, look, there's snow on all of those chairs over there. Look at all the snow on those chairs. Would that be the truth or a lie?" and she responded, "Lie." The court asked, "[I]f I were to ask you how old are you, and you said 65, would that be the truth or a lie?" She responded, "A lie."

The court commented it was "struggling with whether to swear this witness. And I will not do so at this time. And I'm going to ask more questions without swearing in the witness." The court then asked Navarrete about her family relationships. She said she liked going out to eat and taking walks with her younger brother, Adrian. She resisted the court's suggestions that they took their dogs with them on their walks. She struggled to make herself understood when asked about problems and disagreements among her family members. With the assistance of Adrian, she managed to communicate that her parents sometimes fought and her father would use the f-word and the b-word at those times. The court asked her whether she'd "ever seen anybody grab a knife or a stick or a gun, anything, and threaten anybody else?" She said she had seen her father with a gun. The court then asked, "What do you remember about a gun? Huh? You remember seeing a gun, or are you not sure about a gun?" She said she wasn't sure about the gun, and then said she'd seen her father grab a knife. She denied seeing anyone else wield a knife.

The court then asked a series of questions about who in her family she wanted to live with and be with. She initially had trouble making herself understood on these questions, but with the assistance of her attorney was able to say she needed help to do certain things and preferred to keep living with her mother and for her mother to be the one who helped her. She also said Adrian can be helpful. But she denied missing her older brother, Rudy, or her father. The court said, "I'd like to see things patch up to where you get a chance to see Rudy and your dad," and asked "Would you like to do that if Adrian is present?" She responded, "No." The court then asked, "If the judge asked you

to see your dad and made sure that somebody nice was present, maybe Adrian, if he's willing to, would you do it. Would you see your dad?" She again responded, "No."

Finally, the court asked Navarrete whether she was mad at anybody in her family. She was able to say she was mad at her father and older brother, but had difficulty communicating why. With the help of her attorney she was able to say she was mad at her older brother because he yelled in her ear. But she wasn't able to communicate why she was mad at her father. The court called her younger brother up to assist the attorney, but her answers were unintelligible other than to express that she was extremely mad at her father.

At that point the court abruptly ended the examination.

D. *Trial Court Rulings*

At the end of Navarrete's interview, the trial court ruled she would not be sworn as a witness and was disqualified from giving testimony. Navarrete was then excused from the courtroom. After a break, Navarrete's attorney requested permission to have her return to the courtroom to make a further attempt to qualify and provide testimony. The court denied the request.

The court explained, "I think that what we should do now, and realizing that perhaps both sides are unhappy with the way I've conducted the examination of Anna, and recognizing that this Court was not comfortable swearing her as a witness. I think [the judge in another case involving Navarrete] probably got it right that she might not be a competent witness. It seemed like a close call to me. And I thought about swearing her

11

in once, and I thought about swearing her twice, and I didn't do it. [¶] . . . [¶] I had more than one reason for not swearing her. One reason was that it truly seemed like she was subject to suggestion in terms of little things. I asked what she did during the day, she didn't tell me. I gave her three examples, and she told me those three things. People who take suggestion as to little things perhaps would not take suggestion as to big things. [¶] . . . I don't want to imply that this person was simply a parrot in terms of giving back whatever words I had spoken to her. No, it wasn't that clear. It was more difficult than that. And it's too important not to be deceived by her speech impediment. Not an easy assessment, folks. Not an easy assessment whether to swear her in or not. This Court chose not to. Maybe a judge with greater skill at the examination would have made a different choice. . . . My own view is to the extent that I have any ability to these things, I gave her many a chance to say many a thing, and here we are."

The court then granted mother's petition to be Navarrete's conservator and denied Rudy's petition. On June 21, 2017, the court entered an order appointing mother as Navarrete's conservator and issued her letters of conservatorship of the person. The court granted father's request for a domestic violence restraining order. No one challenges these rulings on appeal.

On visitation, the court said its job was to assess ordering visitation from the standpoint of Navarrete's best interests. "[F]or an adult conservatee, the standard is supposed to be what is in the best interest of the conservatee. And one thing I learned from Anna in talking to her is she seems firm that she doesn't want to visit with her dad

12

or her brother Rudy. . . . [¶] An adult has no right to visit an adult child. If my son ever wanted to tell me, You'll never see me again, it's too horrible to imagine, but he would have the right to say so. [¶] But the evidence of alienation . . . the apparent alienation by [mother] of father and daughter, makes the person think that some amount of supervised visitation should be granted because it would be in the best interest of Anna, because it's not in her best interest to be alienated from her father."

The court acknowledged doubt as to whether her father had sexually assaulted her. "The trouble is that I need to be honest and admit that I don't know whether Rodolfo had sex with his daughter. It seems more probable that he did not have sex with his daughter. On a close call, I just don't seem to have enough to find that he did." The court continued its explanation of its ruling, "So here I am not knowing if he had sex with his daughter, but finding there's not enough evidence to say that he did. And then if I have the visitation forced, then in case I'm wrong and he did have sex with his daughter, then I'm making her visit with her molester. I don't like that very much, if that's what it is. But I don't think that's what it is. I think he probably didn't have sex with his daughter."

At bottom, the court indicated it thought it was in Navarrete's best interest to have a connection with her father, even if that would require considerable work to achieve. The court explained, "It seems as if Maria has taken many steps to alienate Roldolfo from Anna. That's not in Anna's best interest; therefore, it would seem like it's in her best interest to have some visitation forced by the Court, albeit supervised visitation." The court said ordering visitation would allow everyone to "[s]ee if maybe everybody can

13

calm down. If he really had sex with his daughter, she'll never calm down. If he didn't, at some point she'll realize she's forgiven for implying or saying that he did, and maybe things will get better. I don't know." Nevertheless, the court withheld ruling on visitation immediately and asked the parties to try to reach an agreement.

They didn't agree, as became clear at a review hearing on August 10, 2017. Navarrete again opposed visitation, and her father requested one hour of visitation a week in the presence of his own treating therapist. The court set a new hearing and had the record reflect Navarrete "is crying and her brother and advocacy person are leading her outside." After a hearing on September 15, 2017, the court found "contact with Father in a therapeutic setting is beneficial to Anna Navarrete, although conservator, conservatee and conservatee's therapist and conservatee's attorney all disagree." On March 8, 2018, the court entered its findings and issued an order that Navarrete and her father attend joint counseling sessions with a neutral therapist. The court ordered the sessions to be held once or twice a month in the discretion of the therapist.

Navarrete filed a timely notice of appeal challenging the visitation order. Father didn't cross-appeal and failed to file a respondent's brief after requesting an extension and receiving a warning that we would decide the case based on Navarrete's arguments alone if he did not.

14

## II

## ANALYSIS

Navarrete challenges the visitation order on several grounds. She argues ordering her to attend joint therapy sessions with her father was beyond its authority under the conservatorship statute, violated her privacy rights under the United States and California Constitutions and, even if the order was permissible, it was an abuse of discretion for the trial court to determine forced visitation with her father was in her best interest.[2]

We review for abuse of discretion trial court decisions affecting the scope of a conservator's powers. An abuse of discretion occurs only where the decision is outside of what is allowed by the governing law or where there is no reasonable basis for the court's action. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

The Probate Code sets out when it's appropriate for a trial court to appoint a conservator of the person (conservator) as well as the general powers of such a conservator. The trial court may appoint a conservator for someone "who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter." (Prob. Code, § 1801, subd. (a).) Once appointed by the trial court, a conservator "has the care, custody, and control of, and . . . charge of the education of . . . the conservatee." (Prob. Code, § 2351, subd. (a).)

---

[2] Navarrete also argues the trial court erred by not allowing her to testify. We don't address this issue because we reverse the trial court visitation order on other grounds.

15

Though appointment invests a conservator with broad powers, the statute also explicitly reserves certain rights to the conservatee. The conservator's "control *shall not* extend to personal rights retained by the conservatee, including, but not limited to, the right to receive visitors, telephone calls, and personal mail." (Prob. Code, § 2351, subd. (a), italics added.) The designation of a person as a conservatee doesn't divest them of their autonomy. The purpose of the statute is to ensure the care and protection of people who need it, while maintaining their personal agency as much as is practical.

These personal rights are so important the Legislature gave the courts the power to intervene on a conservatee's behalf to ensure they may exercise them. The statute expressly allows the courts to enter an order that "grants the conservator the power to *enforce* the conservatee's rights to receive visitors . . . or that *directs* the conservator to *allow* those visitors." (Prob. Code, § 2351, subd. (a), italics added.) Thus, the courts have a role as a protector of a conservatee's ability to exercise their rights to receive visitors. If a conservator needs an express court order giving them the power to enable the conservatee to see the visitors they choose, the court may issue such an order. And if a conservator is interfering with the conservatee's decision to receive visitors, the court may direct the conservator to stand aside and let the conservatee make the decision for themself. The court makes such determinations in the best interests of the conservatee.

The statute also gives the trial court the power to expressly limit the statutory powers given a conservator over the conservatee at the outset of the conservatorship. "Where the court determines that it is appropriate in the circumstances of the particular

conservatee, the court, in its discretion, may limit the powers and duties that the conservator would otherwise have under subdivision (a) by an order stating either of the following: [¶] (1) The specific powers that the conservator does not have with respect to the conservatee's person and reserving the powers so specified to the conservatee[, or] [¶] (2) The specific powers and duties the conservator has with respect to the conservatee's person and reserving to the conservatee all other rights with respect to the conservatee's person that the conservator otherwise would have under subdivision (a)." (Prob. Code, § 2351, subd. (b).) Thus, the statute allows the court to narrow the conservator's authority with the purpose of *expanding* the conservatee's personal rights.

The statute does not similarly suggest the court has the power to force an unwanted visitor on the conservatee. We're not asked to decide whether the court properly could allow the conservator to stop Navarrete from seeing someone who was exercising undue influence on her or engaging in unwanted or unsafe sexual contact. We're asked to decide whether the trial court's statutory power to limit Navarrete's personal rights to receive visitors extends to allowing the court to *require* a conservatee to receive a visitor she and her conservator insist she does not want to see.

We are aware of no case reading the statute to allow a conservator or a court to *require* an adult conservatee to spend time with someone against their will, even a parent. As the trial judge recognized, speaking of his own adult child, "An adult has no right to visit an adult child. If my son ever wanted to tell me, 'You'll never see me again . . . he would have the right to say so." The statute distinguishes conservatees, who are adults,

from wards, who are children. The statute treads on the autonomy of conservatees only to the extent required to assist them. The guardianship provisions allow for more court intervention. For that reason, the courts may order a guardian to allow visits from the child's noncustodial relatives if it's in their best interests. (*Guardianship of Reynolds* (1943) 60 Cal.App.2d 669, 676 [under prior statute].)

It's a different matter to require an adult to visit with an estranged parent. Navarrete and conservatees like her are adults, and the statute treats them as such even while investing a conservator and the court with certain powers to assist them where they are unable to assist themselves. Critically, the statute explicitly preserves conservatees' personal rights against invasion by the conservator. (Prob. Code, § 2351, subd. (a).) Such rights, as Navarrete argues, include her right to refuse to visit someone, which implicates the fundamental interest "of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." (*Union Pacific R. Co. v. Botsford* (1891) 141 U.S. 250, 251.)

An adult conservatee's disability does not put them in the legal position of a minor. For example, a conservatee retains the right to marry or enter a registered domestic partnership. (Prob. Code, § 1900 ["The appointment of a conservator of the person or estate or both does not affect the capacity of the conservatee to marry or to enter into a registered domestic partnership"].) Though a conservator or other interested person may petition the trial court for an order finding a conservatee doesn't have the

18

capacity to enter a legal marriage, "'[w]hether the conservatee has capacity to marry is determined by the law that would be applicable had no conservatorship been established.'" (*In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 641.) A conservatee may overcome a petition and retain the right to decide to enter or exit a marriage as long as they have the capacity to express their preference on the matter. (*Id.* at p. 643; see also *In re Marriage of Higgason* (1973) 10 Cal.3d 476, 479.)

In the context of family law orders, the trial courts have no authority to order adult disabled children to visit with a parent. (*In re Marriage of Jensen* (2003) 114 Cal.App.4th 587, 594.) As the Court of Appeal pointed out in *Jensen*, "[v]isitation is a form of custody," and the Family Code section allowing the trial court to impose visitation orders does not reach a child who has attained the age of majority. (*Ibid*.) Navarrete is such a person, notwithstanding her disability, and the trial court's attempt to intervene in the dispute between a disabled adult and her estranged father based on its own judgment about her best interests overstepped its role.

We recognize the significant constitutional problems Navarrete raises with the trial court's order, including her suggestion that the trial court would have had to find visitation in her best interest by clear and convincing evidence. (See generally, *Conservatorship of Wendland* (2001) 26 Cal.4th 519.) But we need not address those questions in this case because we conclude the trial court exceeded its statutory authority by ordering forced visitation against Navarrete's will and against the judgment of her conservator.

19

## III

## DISPOSITION

We reverse the trial court's order requiring Navarrete to attend joint therapy sessions with her father. Navarrete is entitled to her costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

MENETREZ
J.

20

Filed 12/21/20

CERTIFIED FOR PUBLICATION
COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**ORDER**

| | |
|---|---|
| Conservatorship of the Person and Estate of ANNA NAVARRETE. | E070210 |
| | (Super.Ct.No. RIP1600752) |
| RODOLFO NAVARRETE, Petitioner and Respondent, v. ANNA NAVARRETE, Objector and Appellant. | The County of Riverside ORDER MODIFYING OPINION AND GRANTING PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT

We GRANT the request to publish the opinion filed in this matter, which meets the standard for publication in California Rules of Court, rule 8.1105(c). The court ORDERS the opinion filed on December 4, 2020 certified for publication.

On our own motion, the Court ORDERS the opinion modified by removing the words "an Incompetent Person, etc." from the caption to conform with current law and usage. (See, e.g., Prob. Code, §§ 1801, subd. (a) [The trial court may appoint a conservator for someone "who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter"]; 2351, subd. (a) ["the guardian or conservator . . . has the care, custody, and control of, and has charge of the education of, the ward or conservatee"].)

Except for the modification, which doesn't affect the judgment, the opinion is unchanged.

CERTIFIED FOR PUBLICATION

SLOUGH _____
J.

We concur:

RAMIREZ _____
P. J.

MENETREZ _____
J.

cc:     See attached list

1

MAILING LIST FOR CASE: E070210
Conservatorship of the Person and Estate of Anna Navarrete; Rodolfo Navarrete v. Anna Navarrete


Superior Court Clerk
Riverside County
P.O. Box 431 - Appeals
Riverside, CA 92502


Daniel H. Cargnelutti
4212 Market Street, 2nd Floor
Riverside, CA 92501


Mark J. Andrew Flory
Brown White & Osborn, LLP
300 East State Street, Suite 300
Redlands, CA 92373