Filed 3/30/26  Andrea M. v. Paul M. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANDREA M., | B346663 |
| Respondent, | (Los Angeles County Super. Ct. No. 24STFL12058) |
| v. | |
| PAUL M., | |
| Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Josh Freeman Stinn, Judge.  Affirmed in part and reversed in part with directions.

Paul M., in pro. per.; and Sheri Tanaka for Appellant.

No appearance for Respondent.

————————————————

Paul M. (Paul) appeals from a restraining order issued under the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.)[1] at the request of his wife, Andrea M. (Andrea). The restraining order required Paul to move out of the marital residence, gave Andrea sole legal and physical custody of the couple's three teenage children, Rylan, Nicholas, and Sebastian, and permitted Paul contact with the children only during visits supervised by a professional monitor selected by Andrea and paid for by Paul.

As we discuss, the domestic violence restraining order (DVRO) was overbroad in significant part. We therefore direct the trial court on remand to strike Andrea's and Paul's adult son, Rylan, from the order; issue a new custody and visitation order that takes into account Nicholas's and Sebastian's wishes with regard to contact with their father; omit from the order reference to the family's pets; permit Paul access to the minor children's medical and education records; and permit Paul to retrieve his personal property from the family's residence.

### FACTUAL AND PROCEDURAL BACKGROUND

### I.    Divorce proceedings and DVRO petition.

Andrea and Paul were married in 2005 and have three children together: Rylan (born in December 2006), Nicholas (born in May 2009), and Sebastian (born in January 2013). Andrea is a marriage and family therapist who works for a community mental health agency and has a private practice. Paul is a soccer coach.

---

[1]    All undesignated statutory references are to the Family Code.

2

Andrea filed a marital dissolution petition in December 2024. Paul filed a response in January 2025, in which he requested spousal support and sole legal and physical custody of the children.

Andrea filed an application for a DVRO against Paul in February 2025.[2] Andrea stated that Paul had a history of "escalating verbal, emotional, and physical abuse," and he had threatened Sebastian by telling him that his " 'time is coming' " after Andrea filed for divorce. Andrea sought protection for herself, the three children (then ages 18, 15, and 12 years), and the family's pets. She also sought exclusive possession of the family home and sole legal and physical custody of the children with no visitation for Paul.

The trial court granted a temporary restraining order on February 3 and set a hearing for February 28. At the time the temporary restraining order was granted, Andrea, Paul, and the children were still living together.

## II. DVRO hearing.

### A. Andrea's testimony.

The trial court held an evidentiary hearing over portions of three days in February, March, and April. Andrea testified that Paul physically and verbally abused both her and the children. With regard to herself, Andrea said that Paul grabbed her throat during an argument 18 years earlier, when Rylan was a newborn. When Andrea told Paul she was leaving the house, he locked her car keys in the bathroom. Andrea said Paul never again touched

---

[2]     All subsequent dates are in 2025 unless otherwise indicated.

her violently, but he "pin[ned]" her during arguments without touching her. Andrea explained: "He just puts his hands like this when we're close and arguing so I can't get away, but he doesn't touch me." Andrea said Paul had "pinned" her throughout their relationship, most recently during an argument in June 2024.

With regard to physical abuse of the children, Andrea testified to four incidents. The first incident occurred when Rylan "was little." Andrea said that Rylan texted her that Paul had "grabbed [him] by the throat and the hair." When Andrea told Paul that was unacceptable, Paul responded that he had " 'grabbed [Rylan] by the neckline to show him exactly what I needed' " because " 'I can't work with children that choose not to listen to their parents.' " The second incident occurred "when we lived at the house on Curtis."[3] Rylan asked Paul to turn his music down, and Paul shoved Rylan and said he was going to "knock Rylan's fucking head off." The third and fourth incidents occurred in 2020. In May 2020, Nicholas tried to grab his phone from Paul, and Paul "shoved Nicholas down on the ground." Nicholas hit his head and bloodied his nose. In July 2020, Paul shoved Sebastian during an argument.

Andrea also testified that Paul verbally abused her on a regular basis, telling her that she was "a piece of shit" and was not a good mother or wife. In support, she introduced a copy of a text from November 2024 in which Paul said he was "surprised,

---

[3] Andrea did not specify when this incident occurred, but she said in her DVRO request that the family had lived at their current address on Barkley Lane for five years and three months. Presumably, then, the shoving incident occurred sometime prior to the end of 2019.

4

shocked, and disappointed" that Andrea had "not purchase[d] any food or cook[ed] for this weekend/week as you had promised," and had left for the week without "providing any details (e.g., where you would be staying, how long you would be leaving for, where we/the boys could contact you if there was an emergency)." The text continued: "Your actions are unfair, uncalled for, unwarranted, and simply irresponsible as a parent. More than that, you are failing/refusing to provide the boys with a basic necessity for them to live and function (i.e., food). I had provided you with options of going through either Instacart or DoorDash if you were too busy to cook this week, which you simply ignored. [¶] I also do not appreciate you leveraging and using the boys to communicate . . . . For example, when I got home this evening, Nico said that you told him to tell me that I needed to go to Costco after I finished work to shop for food. These are conversations that need to take place between us as adults (not indirectly through the boys). It is our responsibility as parents to ensure that we have clear communications with regards to our children. It makes it somewhat challenging when you fail to provide the details of what is happening in the family, and I learn it through my children because you are unwilling to communicate with me directly. This is an ongoing problem I have in our marriage, and I do not think that the children should be used as pawns in our disagreements. Unfortunately, your actions continue to display your inability to provide proper guidance, care, and support to our children."

Subsequently, Paul texted Andrea: "Thank you for confirming that you are refusing to pay any funds whatsoever for food for our children after you left the family for an unspecified period of time. As you already know, since you forced me to give

up other business opportunities I was pursuing due to your unreliable and neglectful actions, I simply cannot cover your portion for food. . . .  Please understand I simply do not have the time for your games nor do I have the money to pay for the service charge given that there is now an overage on our joint account because you are refusing to pay for a basic necessity (i.e., food) for your children."

Andrea also played two recordings of interactions between her, Paul, and the children that she said illustrated Paul's verbal abuse of the boys.[4]  In the first recording, Paul yelled at one of the boys about comments he had made to Paul in public.  Paul said:  "[I]f you don't want to listen, . . . [t]hen you don't get my support.  You don't get anything [from] me, because I don't want a child that's going to be disrespectful. . . .  [Y]ou're the one with the fucking issues."  In the second recording, made in July 2023, Paul and Nicholas argued, and Paul told Nicholas:  "You're on your own for practices, and you're on your own for [a soccer game in] Phoenix . . . .  I don't need you on the team anymore. . . .  You're a disappointment, you're a disappointment as a fucking son."

Andrea testified that in November and December 2024, she worked away from home for a period of time to earn extra money and to try to de-escalate the tension in the house.  The boys stayed home with Paul, and Andrea saw them on the weekends.  Andrea didn't worry that Paul would hurt the kids because she "knew the kids would tell [her] if he did," "like when Sebastian

---

[4]     The recordings are not part of the appellate record, but transcripts of the recordings are attached to Andrea's petition.

called me the very first night in December, crying that Paul had taken away his Xbox for no reason."

Andrea filed for divorce in December 2024. She said that after she filed, she was concerned that Paul might harm her or the children. She nonetheless sought joint legal and physical custody with Paul because she was "trying to make it as easy as possible and not rock the boat." At that time, she continued to live with Paul and to share a bed with him because "our house is very tiny [and] there's not another place to sleep" and she "didn't want to cause any waves." She ultimately decided to seek a DVRO because she "realized that [she] needed to stop the cycle" of abuse and that it "was going to be the only way to protect us because things got really toxic around the house, especially after [she] filed" for divorce.

Andrea said the children had been "terrified" of Paul for years, and she was scared of Paul when he yelled. She believed that she and the children were in danger of being abused by Paul if the court did not enter a restraining order. She hoped the court would give her full custody of the kids and allow Paul to see the kids only in public places because when Paul got angry and was in a private place, "things go sideways."

### B.    Nicholas's testimony.

Nicholas, then age 15, testified about an incident a few years earlier when he and his father argued and Paul took away his phone. Paul pushed Nicholas when he went to get the phone to plug it into a charger. Nicholas fell to the floor and developed a bloody nose. Nicholas said he didn't know why his nose began bleeding—"I don't know if my head hit something or maybe my head hit the floor"—but when he got up, he had a bloody nose. There were other incidents where Paul "rush[ed]" him into a

7

wall—"like, walking with a pace, like, fast towards us, kind of like barricading us next to a wall," so he "couldn't move anywhere else"—but "nothing physically ever really happens."  The last such incident happened about a year earlier.  Nicholas felt "a little scared but kind of neutral" when Paul "rush[ed]" him.  Nicholas had seen his father similarly "rush[ ]" his younger brother Sebastian.

Nicholas also testified that Paul had occasionally been verbally abusive, "yelling, cursing, stuff like that."  He described an incident in May 2024 when he and Paul had argued in the car, and Paul called him a "retard" and made Nicholas walk the rest of the way to school.  The same day, Paul texted Nicholas that he would not take Nicholas to soccer practice because he would "not be disrespected by you or anyone within this household."  After that incident, Paul refused to drive Nicholas to school or soccer practice for four or five months.  Instead, Andrea would drive Nicholas or he would ride his bike or take an Uber.  Another time, Paul told Nicholas he was a " 'disappointment as a son.' "  That made Nicholas feel disappointed and sad.  Nicholas was sometimes "scared" of his father, but was not "terrified" of him.

Nicholas and his brothers sometimes stayed alone with Paul when Andrea traveled for work, most recently in November or December 2024.  Nicholas wasn't scared to be alone with his dad.

Nicholas acknowledged writing the following message in an undated birthday card to Paul:  " 'Happy birthday, dad.  I know we argue and fight, but that doesn't take away how much I love you and care about you.  You're always there for me.  And I can trust you with anything.  You've raised us so well, and I'll always

thank you for that.  So have a great birthday, and I love you.' "
Nicholas said he was sincere when he wrote that.

### C.    Paul's testimony.

Paul denied that he ever grabbed Andrea by the throat or locked the car keys in the bathroom when Rylan was a baby.  He denied ever barricading Andrea or any of his sons, shoving Rylan or Sebastian, telling Rylan that he "suck[ed]," was "horrible," was "an embarrassment," or "nobody wants you," touching his children in a way that caused them pain or injury, or grabbing any of the children by the throat or the neck.

Regarding the incident in which Nicholas's nose was bloodied, Paul said he took Nicholas's phone and Nicholas tried to grab it back.  When Paul let go of the phone, it hit Nicholas on the nose and Nicholas fell to the ground.  Paul never intended for Nicholas to be struck in the nose.

Paul acknowledged that after Nicholas treated him disrespectfully, he did not drive Nicholas to school or practice for five months.  He also acknowledged that in November 2023, he told Nicholas that he was " 'a disappointment as a fucking son' " and was "now on his own."  And, he acknowledged a recording from July 2023 in which he said:  " 'You don't get my support. You don't get anything from me because I don't want a child that is going to be disrespectful.' "

Paul also acknowledged texting Sebastian that, " 'your time is coming.' "  He meant that when you do something wrong, life will catch up to you.  Sebastian had been disrespectful and had talked back a lot, and Paul "was trying to articulate to him that in life, you have to treat people with respect and dignity and the way he was handling himself wasn't the proper way."

9

Paul testified that he and Andrea had different views on how to raise and discipline children. He explained: "[B]ecause Andrea was always out working, I was more of a disciplinary individual. I had to teach my children . . . . It was about accountability. It was about respect. It was about integrity. I had to implement and showcase these values to them at a young age and Andrea was more of . . . a friend. I'll be here. If she was around, great. If she wasn't, I handled all those responsibilities to ensure that my children when they went out in public, they respected their neighbors and they respected another family, a mother, a child. . . . It was more of me being, you know, I think in today's society, a mother and father. Being able to kind of implement these important values that unfortunately a lot of these children do not have."

Paul said his relationship with his sons had always been solid and loving until the restraining order was put in place. He never rushed or pinned his kids.

## D.    Trial court's findings and order.

On April 11, the trial court entered a DVRO protecting Andrea, Rylan, Nicholas, and Sebastian from Paul. The order directed Paul to move out of the family home; to stay 100 yards away from the family home, Andrea's workplace, the children's schools, and the family's pets; not to contact Andrea except through Talking Parents; and not to contact the children except during monitored visits. The order further granted Andrea sole legal and physical custody of the children, and permitted Paul three-hour visits with the children on the first and third Sundays of each month. Visits were to be in a public place and monitored by a professional monitor chosen by Andrea and paid for by Paul. Paul was specifically directed not to attend any of the children's

10

sporting events, and he was denied access to the children's educational and medical records.

In connection with the DVRO, the court made the following oral findings:

"The court found [Andrea's] testimony to be credible including her testimony of dad's conduct[,] including testimony about him . . . pinning and barricading both her and the children at different times, his name calling and belittling of her, grabbing Rylan by the throat and the hair, shoving Nicholas, intentionally or recklessly causing him to fall which resulted in a bloody nose, shoving Sebastian with threats to knock his fucking head off.[5]

"The court found Nicholas's testimony to be credible. Nicholas testified to the incident where dad pushed him where he fell and it resulted in a bloody nose. Nicholas testified to various incidents of dad rushing and blocking and barricading.

"The court does find dad created a culture within the home of intimidation and control which formed the pattern of conduct.

"The court found Nicholas's testimony about . . . dad calling Nicholas a retard . . . credible as well.

"Under [section] 6203, of course, we know that abuse is either intentional or reckless as the court alluded to. The pushing of Nicholas causing him to fall and resulting in a bloody nose, . . . if it wasn't intentional, it certainly would have been reckless.

"In terms of dad's conduct with the rushing and the barricading, the question is whether or not that creates a

---

[5]  Andrea's testimony was that this incident involved Rylan. Presumably, the court misspoke when it referred to Sebastian.

reasonable apprehension of imminent bodily injury. Given the context and the history and the threats, I think it does.

"The court is also going to find that dad's conduct toward mom, the insults, the belittling, the rushing of the children, barricading, did disturb her peace and destroy her emotional calm.

"The court also points counsel to the case of *Perez v.* [*Torres-Hernandez* (2016) 1 Cal.App.5th 389], that stands for the proposition that it does destroy someone's mental peace and emotional calm when children are being abused.

"Accordingly, the court is going to grant the request for the restraining order. However, I am not going to make it for five years. I am going to make it for three years. I do find good cause given the nature of the abuse to include Rylan, Nicholas and Sebastian. I understand that Rylan is 18 and will soon be going to college but he is still a household member. [¶] . . . [¶]

"I'm going to include a no-contact provision, which means [Paul is] going to be prohibited from contacting either [Andrea] or the [children] directly or indirectly by any means including telephone, mail, email or other electronic means. However, I am going to make an exception . . . [for] dad [to] contact mom via Talking Parents. [¶] All communications shall be child focused. In other words, it's only about what is going on with the kids . . . . [W]e're talking about the kinds of things that parents would need to share information on like doctors' visits, check-ups, major milestones, things like that. Custody exchanges, visitation times. . . . [¶] . . . [¶]

"[Paul] is going to be ordered to stay 100 yards away from the home, [Andrea], her job or her workplace or her vehicle, the . . . children [and] the children's school[s].

"I am going to include an exception . . . that dad . . . is going to be permitted to have monitored visitation and that will be the exception to the stay-away order.

"I am going to sustain the prior order of the move out, which is that mom is going to be granted exclusive access and use of the marital home for the time being. . . .

"I'm including the animals . . . for protection as well.  That is . . . the family dog[s] Milo [and] . . . Rambo, and the three chickens.[6]  [¶] . . . [¶]

"The court is going to grant mom sole legal and sole physical custody.  Dad is going to be permitted to have professionally supervised visitation.  Mom is to choose a monitor. . . .  Dad is going to be responsible for covering 100 percent of the fees associated with the monitored visitation.

"I'm going to permit dad's visitation on the first and third Sunday of each month and it's going to be for three hours by mutual agreement.  [¶] . . . [¶]  . . . All visitations are to be in a public location.  And dad shall not attend any of the [children's] sporting events."

## III.  Subsequent proceedings.

Paul filed a request for a statement of decision on April 14, but no such statement was issued.  Paul filed a notice of appeal of the DRVO on May 23.

On May 27, Paul filed an ex parte request to modify the DVRO.  Paul asked that Rylan, who was then 18 years old, be excluded from the order, and that Paul be allowed to attend

---

**6**      Although Andrea's DVRO request sought protection for the family's pets, there was no testimony at the hearing suggesting that Paul had injured or threatened to injure the pets.

Rylan's high school graduation.  The court denied the request, finding that Paul had not made a showing of immediate irreparable harm warranting emergency relief.

Paul filed a further request to change court order on May 30, and on June 11, he filed a request for spousal support, attorney fees, access to his personal belongings in the marital home, and to be permitted contact with Rylan "once he has moved from the marital residence . . . and moved on campus to the University of Hawaii."  Among other things, Paul said in a supporting declaration that he had been homeless since he was forced to leave the marital home in February, had exhausted his savings and run up credit card debt to pay his lawyers, and had not been able to see his children for months because he could not afford the professional monitor's fees.  Further, although the court had not ordered him to do so, he had enrolled in and completed an anger management class "with the hopes that this will aid in reunification with my children."  He concluded:  "I love all three of my children and miss them dearly.  I long to see their faces, hug them, and hear how they are doing."

On June 20, the court found that because Paul had filed an appeal of the DVRO, the court "does not currently have jurisdiction to change or end the restraining order."  The court nonetheless amended the restraining order to eliminate custody and visitation orders relating to Rylan, who had turned 18 years old.  Paul's request to change or end the restraining order was otherwise "stayed based on the pending appeal."

14

# DISCUSSION[7]

Paul contends that the trial court abused its discretion by including the children and the family pets as protected parties; failing to issue a statement of decision; granting Andrea relief she had not requested; permitting Andrea to introduce evidence that was not timely submitted, was hearsay, and was unauthenticated; and barring Paul from retrieving his belongings from the family's home. Finally, Paul contends the trial court's cumulative errors denied him a fair hearing. We consider Paul's contentions below.

---

[7] Andrea did not file a brief on appeal. " 'Although some courts have treated the failure to file a respondent's brief as in effect a consent to a reversal, it has been said that the "better rule . . . is to examine the record on the basis of appellant's brief and to reverse only if prejudicial error is found." ' (*In re Bryce C.* (1995) 12 Cal.4th 226, 232–233.) This approach gives full effect to the presumption that the judgment or order appealed from is correct and that, in order to prevail, the appellant has the burden to not only overcome that presumption but also demonstrate reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)" (*Farnum v. Iris Biotechnologies Inc.* (2022) 86 Cal.App.5th 602, 608.) We follow that approach here, examining the record on the basis of Paul's brief and reversing only where we find prejudicial error. (See *In re Marriage of M.P. and M.C.* (2025) 116 Cal.App.5th 1096, 1106, fn. 5 ["In view of the important policies advanced by the Domestic Violence Prevention Act, and the overriding need to protect Wife and the minor children from abuse, we 'examin[e] the record on the basis of appellant's brief and revers[e] only if prejudicial error is found' "]; *Rooz v. Kimmel* (1997) 55 Cal.App.4th 573, 594, fn. 12 [adopting the "better practice of examining the record on the basis of appellant's brief and reversing only if prejudicial error is found"].)

15

## I. Paul has not complied with his duty to provide a summary of all the significant facts.

"Rule 8.204(a)(2)(C) of the California Rules of Court imposes a duty on an appellant to '[p]rovide a summary of the significant facts limited to matters in the record.' The *significant facts* are not simply the facts favoring the appellant. Rather, 'An appellant must fairly set forth all the significant facts, not just those beneficial to the appellant.' " (*Perry v. Kia Motors America, Inc.* (2023) 91 Cal.App.5th 1088, 1096.)

Paul's appellate briefing does not comply with this rule. Notably, Paul's opening brief does not discuss Andrea's testimony that Paul "pinned" her throughout their relationship, shoved and pinned the children, and was verbally abusive. Paul also fails to acknowledge Nicholas's testimony that he developed a bloody nose as a result of Paul pushing him, that Paul "rush[ed]" him and Sebastian into walls so they "couldn't move anywhere else," and that Nicholas felt "a little scared" when Paul rushed or pinned him. To the contrary, Paul insists that Nicholas "never said Paul caused the [bloody nose]" and "admitted he was not afraid of his father."

The failure to provide a fair summary of the evidence forfeits the claims on appeal. (See, e.g., *Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 598; *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 415.) Nonetheless, because this appeal concerns not just Andrea and Paul, but also their children, we will address Paul's contentions on the merits.

16

**II. The conduct of the trial did not violate Paul's due process rights.**

Paul contends that the trial court abused its discretion and violated Paul's right to due process in a variety of ways. Specifically, Paul urges that the trial court failed to issue a statement of decision; granted Andrea relief she had not requested; permitted Andrea to introduce evidence that was not timely submitted, was hearsay, and was unauthenticated; and erroneously credited Andrea's testimony. Paul's contentions lack merit, as we discuss.

**A. Failure to issue a statement of decision.**

Under Code of Civil Procedure section 632, "[t]he court shall issue a statement of decision . . . upon the request of any party appearing." If the trial "is concluded within one calendar day or in less than eight hours over more than one day," a request for statement of decision "must be made prior to the submission of the matter for decision"; otherwise, the request must be made "within 10 days after the court announces a tentative decision." (*Ibid.*) The statement of decision "shall be in writing, unless the parties appearing at trial agree otherwise; however, when the trial is concluded within one calendar day or in less than 8 hours over more than one day, the statement of decision may be made orally on the record in the presence of the parties." (Code Civ. Proc., § 632, subd. (b).) A trial court's error in failing to issue a statement of decision is not reversible per se, but is reviewed for harmless error. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.)

In the present case, Paul filed a request for a statement of decision on April 14, three days after the trial court issued the

17

DVRO. The request therefore was timely if the trial was more than eight hours, but untimely if the trial was less than eight hours. Although the trial was held over portions of three days, we cannot determine whether it exceeded eight hours because neither the reporter's transcript nor the minute orders contain time stamps. Paul thus has not satisfied his appellate burden of demonstrating error. (See *Jameson v. Desta*, *supra*, 5 Cal.5th at pp. 608–609 ["it is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment"].)

In any event, the purpose of a statement of decision "is to permit meaningful review by the appellate court." (*S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 346.) Because the court made oral findings setting forth its reasons for the DVRO, the absence of a statement of decision does not hamper our review. (*In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1494, fn. 3.) Any error, thus, is harmless.

### B. The trial court did not grant Andrea relief she did not request.

Paul contends that the DVRO violated his right to due process because it granted relief that Andrea had not requested and of which he had no prior notice. Specifically, Paul contends that Andrea's request for a restraining order did not allege any acts of physical violence and did not seek orders relating to the children, the marital property, or the family's pets.

The trial court record does not support Paul's contention. Andrea's DVRO request asserted that Paul "physically abused our sons (shoving to the ground and causing a bloody nose;

18

grabbing by the throat and hair) while in a shouting rage," "continuously threatens me and the children with verbal, emotional, financial, and physical abuse in the home," "has grabbed the children by the hair, throat, and body while enraged on multiple occasions," pulled Sebastion's hair, "snatched [Nicholas's] phone from his hand and knocked him to the ground, giving Nicolas a bloody nose," and "grabbed our son Rylan by the throat in a rage." Further, Andrea's DVRO request specifically sought a move-out order, protection for the couple's three children and the family's pets, a grant of full legal and physical custody to Andrea, and no visitation for Paul. The scope of the hearing and order, therefore, did not exceed Andrea's request.[8]

### C. Evidentiary rulings.

We review a trial court's evidentiary rulings for an abuse of discretion. (*640 Octavia LLC v. Walston* (2025) 111 Cal.App.5th 861, 868–869.) " 'In deciding whether the trial court's order[ ] excluding evidence . . . constituted an abuse of discretion, we "view the entire record in the light most favorable to the court's ruling, and draw all reasonable inferences in support of it. [Citation.] . . . . The trial court's decision will be reversed only 'for manifest abuse exceeding the bounds of reason.' " ' " (*Ibid.*)

Paul makes a variety of claims of evidentiary error. None has merit.

*Admission of Andrea's exhibit book.* Paul contends that on the first day of the hearing, over his counsel's objection, the trial

---

8       At oral argument on appeal, Paul's counsel noted that the DVRO denied Paul access to the children's educational and medical records, which Andrea had not requested in her petition. We address this issue below.

court allowed Andrea to provide "an entirely new 'exhibit book' " that contained exhibits Paul had no opportunity to review or rebut. The record is to the contrary. The reporter's transcript demonstrates that when Andrea's counsel handed the court and the witness a copy of Andrea's exhibit book on the first morning of the hearing, the court inquired whether Andrea's counsel had also provided a copy of the exhibits to Paul's counsel. Andrea's counsel responded that she had "sent [them] electronically to Mr. Maier, and I just provided counsel, at counsel table, hard cop[i]es as well." Paul's counsel did not object or suggest that he had not timely been provided a copy of Andrea's exhibits. Paul's suggestion that he was ambushed by the introduction of new exhibits at trial thus lacks support in the record.

*Exclusion of Paul's rebuttal exhibits.* Paul contends that the trial court erred by excluding his rebuttal exhibits, including a birthday card from Nicholas to Paul and photographs of meals Paul prepared for the family. However, the minute orders Paul cites in support reflect the *admission* of Paul's exhibits, including the birthday card, and the reporter's transcript reflects that the photographs were also admitted.[9]

*Admission of Andrea's notes.* Paul contends that the trial court erred by admitting Andrea's notes, which he characterizes as "classic hearsay." In fact, Andrea's notes were marked for identification but were not admitted into evidence.

*Admission of Andrea's audio recordings.* Paul contends that the trial court violated Penal Code section 632 by admitting

---

[9]     Paul also contends that the trial court excluded his texts to Sebastian's soccer coaches, but no such text messages are referenced in the appellate record.

20

into evidence two audio recordings that Andrea made without Paul's knowledge. Penal Code section 632 generally prohibits the admission in a judicial proceeding of intentional electronic recordings of confidential communications without the consent or knowledge of all parties, but there are some statutory exceptions. (Pen. Code, § 632, subds. (a) & (d).) One such exception is set forth in Penal Code section 633.6, subdivision (b), which provides that "a victim of domestic violence who is seeking a domestic violence restraining order from a court, and who reasonably believes that a confidential communication made to him or her by the perpetrator may contain evidence germane to that restraining order, may record that communication for the exclusive purpose and use of providing that evidence to the court."

Paul suggests that the recordings should not have been admitted because they did not demonstrate abuse. But under the statute, the admissibility of the recordings turned not on their contents, but on Andrea's purpose in making them—i.e., whether she "reasonably believe[d] that [the recording] may contain evidence germane to [a] restraining order." (Pen. Code, § 633.6, subd. (b).) Below, Andrea testified that she made the recordings because knew that she "at some point, might need to report [Paul] for child abuse." The trial court thus did not abuse its discretion by crediting Andrea's testimony and concluding that the recordings were admissible under this section.

*Admission of texts and emails.* Paul asserts that the trial court erred by admitting a "handful of text messages and emails" that were never properly authenticated. Paul does not identify the particular exhibits he believes should not have been admitted, but he presumably is referring to Andrea's Exhibits 1,

21

3, 6, and 15, which are texts and emails between the parties. Paul's counsel stipulated to the admission of Exhibit 1, and did not object to the admission of Exhibits 3, 6, and 15. Any objection to the admission of these exhibits, therefore, was forfeited. (*People v. Barrett* (2025) 17 Cal.5th 897, 969 [objection to evidence forfeited if not raised in trial court]; *Wang v. Peletta* (2025) 112 Cal.App.5th 478, 483, fn. 1 [same].)

*Disappearance of exhibits from court files.* Paul asserts that all of the exhibits "vanished" after trial, denying him the opportunity to obtain meaningful appellate review. He does not explain why he could not provide the court with his own copy of the admitted exhibits or obtain a copy from his or Andrea's attorney. In any event, all or most of the admitted exhibits appear to have been either attached to Andrea's petition or read into the oral record. We therefore perceive no prejudicial error.

## D. The trial court did not abuse its discretion by crediting Andrea's testimony.

Paul contends that the trial court abused its discretion by crediting Andrea's testimony "despite her own admissions, contradictions, and conduct that rendered her account implausible." Paul notes that Andrea admitted that Paul had physically abused her just once, 19 years before the DVRO hearing; although Andrea was a mandated reporter, she had never reported any abuse of herself or the children; Andrea continued sharing a bed with Paul until she served him with the DVRO application; Andrea told Sebastion that she was " 'not scared' " of Paul; and Andrea left the children in Paul's care for several weeks in November and December 2024. Paul also contended that Andrea's testimony was "riddled with

22

contradictions and factual impossibilities" that "destroyed her credibility."

In making this contention, Paul is asking this court to do something—revisit the trial court's credibility findings—that the law forbids us to do. "[T]he trial court is best situated to exercise discretion to grant or deny the DVRO request after evaluating the credibility of the parties and weighing the evidence." (*X.K. v. M.C.* (2025) 112 Cal.App.5th 1287, 1298; see also *In re Miguel J.* (2025) 114 Cal.App.5th 635, 645 [" ' " 'issues of fact and credibility are the province of the trial court' " ' "].) Thus, appellate courts "do ' "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." ' " (*Ridley v. Rancho Palma Grande Homeowners Assn.* (2025) 114 Cal.App.5th 788, 800; see also *People v. Alvarez* (2025) 18 Cal.5th 387, 435 [" 'Our review "accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence" ' "].) Instead, because we " 'review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses,' " we must "defer 'to the trier of fact on such determinations, and ha[ve] no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence.' " (*Newman v. Casey* (2024) 99 Cal.App.5th 359, 378.) We therefore reject Paul's suggestion that the trial court erred in crediting Andrea's version of events and rejecting his.

23

## III. The DVRO was overbroad with regard to the children and the family's pets.

Having concluded that the trial court did not abuse its discretion by the manner in which it conducted the trial, we now turn to the DVRO's terms. As we discuss, the DVRO was overbroad because it included Rylan as a protected party, made custody and visitation orders as to Nicholas and Sebastian without considering their wishes and best interests, and protected the family's pets. We therefore will reverse the DVRO in part and remand the matter to the trial court for further proceedings.

### A. Legal standards.

The DVPA permits a trial court to issue a DVRO "to provide for a separation of the persons involved in . . . domestic violence" upon "reasonable proof of a past act or acts of abuse." (§§ 6220, 6300.) Past abuse must be proven by a preponderance of the evidence. (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116; *In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226.)

" 'Domestic violence' " is "abuse perpetrated against" a spouse or child of a party, among others. (§ 6211.) To " 'abuse' " means (1) "[t]o intentionally or recklessly cause or attempt to cause bodily injury," (2) to "[s]exual[ly] assault," (3) "[t]o place a person in reasonable apprehension of imminent serious bodily injury to that person or to another," or (4) "[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a).) Section 6320, in turn, permits a court to enjoin a party from "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly

24

impersonating . . . , falsely impersonating . . . , harassing, telephoning, . . . destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party." " '[D]isturbing the peace of the other party' " is "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).) Such conduct includes "coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (*Ibid.*) Abuse "is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).)

A DVRO may be granted to "any person described in Section 6211," including a spouse or former spouse, and may issue to protect both the petitioner and, "on a showing of good cause, . . . other named family or household members." (§§ 6301, subd. (b), 6211, 6320, subd. (a).) In considering whether a DVRO should issue, "[t]he length of time since the most recent act of abuse is not, by itself, determinative." (§ 6301, subd. (d).) Instead, "[t]he court shall consider the totality of the circumstances." (*Ibid.*) Where appropriate, a court may also issue a child custody or visitation order in a DVPA proceeding. (§ 6223.)

We review the grant or denial of a request for a DVRO and accompanying custody order for an abuse of discretion. (*Navarro v. Cervera* (2025) 108 Cal.App.5th 229, 238; *In re Marriage of F.M. & M.M.*, *supra*, 65 Cal.App.5th at pp. 115–116.) " ' " 'To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review.' " ' " (*Navarro*, at p. 238.)

### B. The DVRO was overbroad as to Rylan.

Paul suggests that the trial court lacked jurisdiction to include Rylan as a protected party because he was 18 years old when the DVRO was issued. Not so. Section 6320 provides that a court may, in its discretion, include "other named family or household members" in a DVRO on a showing of good cause. (§ 6320, subd. (a).) Nothing in section 6320 limits the family members who may be subject to a protective order to minors (*ibid.*), and courts routinely include adult family members in DVROs (see, e.g., *In re Marriage of Reichental* (2021) 73 Cal.App.5th 396, 405 [no abuse of discretion in including husband's girlfriend in DVRO]).[10]

Because the statute permits the inclusion of adults as additional protected parties in DVROs, Rylan was not "beyond the court's jurisdiction," as Paul urges. We nonetheless conclude that the DVRO was overbroad with regard to Rylan. As noted above, a family or household member may be included in a DVRO "on a showing of good cause." (§ 6320, subd. (a).) In determining good cause to include family members as protected parties, the court considers the totality of the circumstances (*K.T. v. E.S.* (2025) 109 Cal.App.5th 1114, 1129; *M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1144), including whether the person to be restrained "presently pose[s] a threat" to those family members

---

[10] *In re Marriage of Jensen* (2003) 114 Cal.App.4th 587 does not suggest to the contrary. *Jensen* held that a trial court lacked personal jurisdiction over an adult child who lived in Thailand, and lacked subject matter jurisdiction to issue a *custody* order concerning the child once he turned 18. *Jensen* did not consider whether a trial court could include an adult party as a protected party in a DVRO.

(*J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 644).  Generally, " ' "good cause as a standard 'is relative and depends on all the circumstances.' "  [Citation.]  " '[I]n determining the meaning of "good cause" in a particular context, the courts utilize common sense based upon the totality of the circumstances,' which 'include[s] the purpose of the underlying statutory scheme.' " ' " (*K.T. v. E.S.*, at p. 1130.)  We review the trial court's good cause finding for substantial evidence.  (*M.S. v. A.S.*, at p. 1143–1144.)

Below, Andrea described two incidents of physical violence involving Rylan—that when Rylan "was little," he reported that Paul had "grabbed [him] by the throat and the hair"; and when the family "lived at the house on Curtis"—i.e., sometime prior to late 2019—Paul shoved Rylan and said he was going to "knock Rylan's fucking head off."  The trial court did not explain why these incidents, which occurred in the family home when Rylan was a child, constituted good cause to issue an order of protection even after Rylan reached adulthood, Paul was removed from the home, and Rylan was moving out of state for college.  We are troubled, moreover, that Rylan was included as a protected party without any evidence of his wishes, and that the DVRO prevented Paul from any contact with Rylan by *any means*, including telephone and email.  It therefore prevented Paul from seeing, calling, and emailing Rylan, and from receiving calls and emails *from* Rylan.  In short, the order completely severed the relationship between Paul and Rylan.

For the foregoing reasons, we conclude that the evidence before the trial court did not support the inclusion of Rylan as a protected party, and we therefore will order Rylan stricken from the DVRO.  Of course, should Rylan desire protection from his father, he is free to seek a DVRO on his own behalf.

27

## C. The DVRO was overbroad with regard to Nicholas and Sebastian.

Paul contends that the DVRO was also overbroad with regard to 15-year-old Nicholas and 12-year-old Sebastian. He urges that the boys were "summarily added" as protected parties, and that the trial court made custody and visitation findings without considering the children's wishes or best interests.

We do not agree that the trial court abused its discretion by including Nicholas and Sebastian as protected parties.[11] As discussed above, there was evidence that Paul had shoved both boys during separate incidents in 2020, within five years of the DVRO proceeding, and that Nicholas had sustained a bloody nose as a result. There also was evidence that Paul "rushed" or "barricade[d]" Nicholas and Sebastian when he was "mad," preventing the boys from "mov[ing] anywhere else." Nicholas said these incidents were not "terrifying," but "there are some instances where I do get scared." Nicholas said the most recent "rushing" incident happened about a year before the DVRO hearing. Nicholas also said Paul was sometimes verbally abusive, explaining that there were a couple of times when arguments "[went] a little south and [got] violent," with Paul

---

[11] Contrary to Paul's assertion, *J.H. v. G.H.*, *supra*, 63 Cal.App.5th at pp. 641–642 does not require a trial court to make a specific finding of good cause before including children in a DVRO. To the contrary, *J.H.* says that section 6340 "only requires that a court *consider* the safety of the petitioner and the children for whom orders under the statute are sought," noting that "[h]ad the Legislature meant to make orders *contingent on a specific finding* or showing, it surely would have said so . . . ." (*Id.* at p. 642, some italics added.)

"yelling, cursing, stuff like that." This conduct, considered together, constituted good cause to include Nicholas and Sebastian as parties protected by the DVRO.

We reach a different conclusion with regard to the custody and visitation order. A custody or visitation order issued in a proceeding brought under the DVPA is subject to sections 3020 to 3204, which govern custody of minor children. (§ 6223.) Section 3040 provides that custody should be granted "according to the best interest of the child." (§ 3040, subd. (a); *Bianka M. v. Superior Court* (2018) 5 Cal.5th 1004, 1020.) Section 3020 further provides:

"(a) The Legislature finds and declares that it is the public policy of this state to ensure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children. The Legislature further finds and declares that children have the right to be safe and free from abuse, and that the perpetration of child abuse or domestic violence in a household where a child resides is detrimental to the health, safety, and welfare of the child.

"(b) The Legislature finds and declares that it is the public policy of this state to ensure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except when the contact would not be in the best interests of the child, as provided in subdivisions (a) and (c) of this section and Section 3011.

29

"(c)    When the policies set forth in subdivisions (a) and (b) of this section are in conflict, a court's order regarding physical or legal custody or visitation shall be made in a manner that ensures the health, safety, and welfare of the child and the safety of all family members."

Upon a finding by a court that a party seeking custody of a child has perpetrated domestic violence within the previous five years against a parent, child, or child's siblings, there is a rebuttable presumption that an award of sole or joint physical or legal custody to the perpetrator is detrimental to the child's best interests.  (§ 3044, subd. (a).)[12]  This presumption may be rebutted by a preponderance of the evidence.  (*Ibid.*; see also *S.Y. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 334 [to rebut the presumption, father who had perpetrated domestic violence "had to show only that, by a preponderance of the evidence, joint or sole custody to him would not be detrimental to [the child's] best interest"].)

Where there has been a finding of domestic violence, the preference for frequent and continuing contact with both parents "may not be used to rebut the presumption, in whole or in part." (§ 3044, subd. (b)(1).)  However, "[t]he legal presumption is not . . . 'that a parent who has committed an act of domestic violence should not be awarded sole or joint legal or physical custody of a child.'  [That parent's] burden [is] only to persuade the court his custody would not be detrimental to [the child's] best interest."  (*S.Y. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 334, italics omitted.)  And, while a domestic violence finding in

---

[12]    Section 3044 was amended effective January 1, 2026.  The sole change made to section 3044 is not relevant to this appeal.

a family law case changes the burden of persuasion, it "does not limit the evidence cognizable by the court," "eliminate the best interest requirement," or "supplant other Family Code provisions governing custody proceedings." (*Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1054–1055.) The statute also does not establish a presumption for or against joint custody: "[A]gain, the paramount factor is the child's health, safety and welfare. (§§ 3020, subd. (a), 3040, subd. (b).) And where the section 3044 presumption has been rebutted, there is no statutory bar against an award of joint or sole custody to a parent who was the subject of the order." (*Id.* at p. 1055.)

With regard to visitation, the court "shall grant reasonable visitation rights to a parent when it is shown that the visitation would be in the best interest of the child." (§ 3100, subd. (a).) If a protective order has been issued restraining a parent, "the court shall consider whether the best interest of the child requires that visitation by that parent be suspended, denied, or limited to situations in which a third person, specified by the court, is present." (§ 3100, subd. (b)(1)(A).) In determining whether visitation with the restrained party is in the best interest of the child, "the court shall consider the nature of the acts that led to the protective order, the period of time that has elapsed since that order, and whether the restrained party has committed further acts of abuse." (§ 3100, subd. (b)(2).)

If a child is "of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation," the court "shall consider, and give due weight to, the wishes of the child in making an order granting or modifying custody or visitation." (§ 3042, subd. (a).) The court may allow a child to address the court or, alternatively, "shall provide alternative

31

means of obtaining input from the child and other information regarding the child's preferences." (§ 3042, subds. (c), (e).) In making custody and visitation decisions, "California courts give special weight to a child's wishes, assuming the child can form an intelligent preference." (*Guardianship of Saul H.* (2022) 13 Cal.5th 827, 854; see also *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 [child's wishes are not determinative, but are relevant to best interests determination].)

Here, 15-year-old Nicholas and 12-year-old Sebastian plainly were "of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation." The trial court therefore should have "considered, and give[n] due weight to, the[ir] wishes" in making a custody and visitation order. (§ 3042, subd. (a).) It did not do so. Although Nicholas testified at the hearing, he was not asked what his wishes were with regard to custody or visitation, and Sebastian did not testify. Nor were the children evaluated by a custody evaluator or represented by counsel. The court therefore had no information about the children's wishes with regard to custody and visitation to inform a best interests analysis. It nonetheless issued an extraordinarily broad order that barred Paul from contacting the boys by phone, email, or text, permitted him only infrequent monitored visits with the boys in a public setting, and precluded him from accessing any health or educational information about his children. Further, as Paul's counsel noted at oral argument, although Andrea's petition requested that Paul continue to have access to records maintained by the children's schools and their medical, dental, mental health, and extracurricular activity providers, the DVRO prevented him from any access to those records.

On the present record, the DVRO was overbroad. While the DVRO's broad provisions might be appropriate in some circumstances—for example, if the children told the court that they feared having overnights with Paul, being alone with him, or having phone or text contact—they were unwarranted on the present record. Nor should the court have ordered Paul to pay for a professional monitor without determining if he could afford to do so. Finally, the trial court should not have prevented Paul's access to the children's education and health records, or extended the custody and visitation order as to Nicholas beyond his 18th birthday.

For all of these reasons, we will reverse the custody and visitation order and the portion of the DVRO precluding Paul's access to the children's education and medical records. On remand, we direct the trial court to conduct a new proceeding in which it considers Nicholas's and Sebastian's wishes with regard to future contact with Paul and, having done so, to enter a new custody and visitation order that gives due weight to the children's wishes and terminates as to Nicholas on his 18th birthday. The trial court is also directed to revise the DVRO as appropriate to accommodate the custody/visitation order, and to permit Paul to access the minor children's education and medical records.

### D. The DVRO was overbroad with regard to the family pets.

We also conclude that the DRVO was overbroad with regard to the family's pets. Section 6320, subdivision (b) provides that on a showing of good cause, the court may give the protected party exclusive possession and control of any animal, and may order the restrained party "to stay away from the animal and

33

forbid the [restrained party] from taking, transferring, encumbering, concealing, molesting, attacking, striking, threatening, harming, or otherwise disposing of the animal." Here, as Paul notes, there was no evidence suggesting that Paul ever injured, or threatened to injure, the family's dogs and chickens. Indeed, the only testimony regarding the pets concerned who typically was responsible for feeding and bathing them. The trial court therefore erred in ordering Paul to stay away from the family's pets.

### E. Paul's right to retrieve his personal property.

We conclude, finally, that the DVRO should have included a provision permitting Paul to retrieve his personal property from the family home. The trial court is directed to include such a provision on remand.

## DISPOSITION

The DVRO and accompanying custody and visitation orders are reversed in part and the matter is remanded to the trial court with directions to (1) strike Rylan as a protected party, (2) eliminate the portions of the DVRO that pertain to the family's pets, (3) permit Paul access to the minor children's education and medical records, (4) conduct a further hearing and issue a new custody and visitation order consistent with the views expressed in this opinion, and (5) permit Paul to retrieve his personal property from the family home.  In all other respects, the DVRO and custody and visitation orders are affirmed.  All parties shall bear their own appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



EGERTON, J.



ADAMS, J.